UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____ X
                                        :
DFINITY FOUNDATION,                     :
                                        :
                    Plaintiff,          :
                                        :          1:22-cv-5418-LAK
        - against -                     :
                                        :
THE NEW YORK TIMES COMPANY, *et al.*,   :
                                        :
                    Defendants.         :
_____ X


### MEMORANDUM OF LAW IN SUPPORT OF THE NEW YORK TIMES DEFENDANTS' MOTION TO DISMISS

Dana R. Green
David E. McCraw
The New York Times Company
Legal Department
620 Eighth Avenue
New York, NY 10018
Phone: (212) 556-5290
Fax: (212) 556-4634
dana.green@nytimes.com

*Attorneys for Defendants The New York Times, Andrew Ross Sorkin, and Ephrat Livni*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................................1

BACKGROUND ............................................................................................................................2

I.      DFINITY FOUNDATION ................................................................................................2

II.     ARKHAM INTELLIGENCE, INC. ..................................................................................3

III.    THE ARTICLE ..................................................................................................................3

IV.     THE COMPLAINT ............................................................................................................5

LEGAL STANDARD.....................................................................................................................6

ARGUMENT ..................................................................................................................................7

I.      THE STATEMENTS AT ISSUE ARE NON-ACTIONABLE OPINION .........................7

II.     THE ARTICLE LACKS DEFAMATORY MEANING ...................................................10

III.    THE STATEMENTS AT ISSUE ARE SUBSTANTIALLY TRUE ...............................13

IV.     DFINITY HAS NOT PLAUSIBLY PLED THAT THE TIMES ACTED
        WITH ACTUAL MALICE................................................................................................15

CONCLUSION.............................................................................................................................18

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Abbas v. Foreign Policy Group, LLC*,
    783 F.3d 1328 (D.C. Cir. 2015) .......................................................................................13

*Ashcroft v. Iqbal*,
    556 U. S. 662 (2009) .........................................................................................................6

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ................................................................................................6

*Biro v. Condé Nast*,
    2014 U.S. Dist. LEXIS 139065 (S.D.N.Y. Sept. 29, 2014) .............................................9

*Biro v. Condé Nast*,
    883 F. Supp. 2d 441 (S.D.N.Y. 2012) ..............................................................................9

*Biro v. Condé Nast*,
    963 F. Supp. 2d 255 (S.D.N.Y. 2013) ........................................................................6, 17

*Buttar v. Hearst Communications, Inc.*,
    No. 21-cv-5566, 2022 U.S. Dist. LEXIS 74960 (N.D. Cal. Apr. 25, 2022) ...................16

*Cabello-Rondón v. Dow Jones & Co.*,
    No. 16-cv-3346 (KBF), 2017 U.S. Dist. LEXIS 131114
    (S.D.N.Y. Aug. 16, 2017) ................................................................................................17

*Carroll v. Trump*,
    ---F. Supp. 3d ----, 2022 U.S. Dist. LEXIS 43512 (S.D.N.Y. Mar. 10, 2022) ...............7

*Celle v. Filipino Reporter Enterprises*,
    209 F. 3d 163 (2d Cir. 2000) ...........................................................................8, 10, 11, 18

*Chau v. Lewis*,
    771 F.3d 118 (2d Cir. 2014) ............................................................................................11

*Contemporary Mission, Inc. v. The New York Times Co.*,
    842 F.2d 612 (2d Cir. 1988) ............................................................................................15

*Cortec Industries, Inc. v. Sum Holding L.P*,
    949 F.2d 42 (2d Cir. 1991) ................................................................................................2

*Croce v. New York Times Co.*,
    930 F.3d 787 (6th Cir. 2019) ...........................................................................................12

*Cummins v. Suntrust Capital Markets, Inc.*,
    649 F. Supp. 2d 224 (S.D.N.Y. 2009) ........................................................................10

*Edwards v. National Audubon Society, Inc.*,
    556 F.2d 113 (2d Cir. 1977).......................................................................................17

*Fairfax v. CBS Broadcasting, Inc.*,
    534 F. Supp. 3d 581 (E.D. Va. 2020) .......................................................................12

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)...................................................................................................15

*Goldman v. Reddington*,
    No. 18-cv-3662, 2021 U.S. Dist. LEXIS 171340 (E.D.N.Y. Sept. 9, 2021) ............7

*Gorilla Coffee, Inc. v. N.Y. Times Co.*,
    936 N.Y.S.2d 58 (N.Y. Sup. Ct. 2011) ......................................................................12

*Guccione v. Hustler Magazine, Inc.*,
    800 F.2d 298 (2d Cir.1986)........................................................................................13

*Harris v. American Accounting Association*,
    No. 20-cv-1057, 2021 U.S. Dist. LEXIS 226517 (N.D.N.Y. Nov. 24, 2021) ...........7

*Harte-Hanks Communications, Inc. v. Connaughton*,
    491 U.S. 657 (1989)..............................................................................................15, 17

*Immuno AG v. Moor-Jankowski*,
    77 N.Y.2d 235 (1991) .................................................................................................8

*Jacob v. Lorenz*,
    No. 21-cv-06807-ER, 2022 U.S. Dist. LEXIS 161822
    (S.D.N.Y. Sept. 7, 2022)......................................................................................11, 17

*Jacobus v. Trump*,
    156 A.D.3d 452 (1st Dep't 2017) ..............................................................................11

*Kesner v. Buhl*,
    No. 20-cv-3454, 2022 U.S. Dist. LEXIS 43094 (S.D.N.Y. Mar. 10, 2022)...............7

*Levin v McPhee*,
    119 F.3d 189 (2d Cir. 1997).......................................................................................9

*Mann v. Abel*,
    10 N.Y.3d 271 (2008) .................................................................................................8

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990)........................................................................................................7

*Mimedx Group, Inc. v. Sparrow Fund Management LP*,
No. 17-CV-07568 (PGG) (KHP), 2018 U.S. Dist. LEXIS 28026
(S.D.N.Y. Jan. 12, 2018).............................................................................................9, 10

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)................................................................................................15

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
720 F.3d 490 (2d Cir. 2013)...................................................................................8

*Palin v. New York Times, Co.*,
940 F.3d 804 (2d Cir. 2019)...................................................................................15

*Printers II, Inc. v. Professionals Publishing, Inc.*,
784 F.2d 141 (2d Cir. 1986)...................................................................................13

*Pritchard v. Herald Co.*,
120 A.D.2d 956 (4th Dep't 1986)..........................................................................10

*Ramsey v. Fox News Network, L.L.C.*,
351 F. Supp. 2d 1145 (D. Colo. 2005)..................................................................12

*Rolon v. Hennenman*,
517 F.3d 140 (2d Cir. 2008)...................................................................................6

*Staehr v. Hartford Financial Services Group*,
547 F.3d 406 (2d Cir. 2008)...................................................................................3

*Steinhilber v. Alphonse*,
68 N.Y.2d 283 (1986) .........................................................................................7, 8

*Sweigert v. Goodman*,
No. 18 Civ. 8653 (VEC) (SDA), 2021 U.S. Dist. LEXIS 77704
(S.D.N.Y. Apr. 22, 2021)........................................................................................7

*Tannerite Sports, LLC v. NBCUniversal News Group*,
864 F.3d 236 (2d Cir. 2017)..................................................................................13

*Weinstein v. Friedman*,
1996 U. S. Dist. LEXIS 3672 (S.D.N.Y. Mar. 26, 1996) ......................................7

*Yangtze River Port & Logistics Ltd. v. Hindenburg Research*,
No. 150721/2019, 2020 N.Y. Misc. LEXIS 877 (N.Y. Sup. Ct. Feb. 25, 2020)....................10

**Statutes**

N.Y. Civ. Rights Law § 76–a.................................................................................7, 15

**Other Authorities**

Fed. R. Evid. 201 ................................................................................................................2

Defendants The New York Times Company and reporters Andrew Ross Sorkin and Ephrat Livni (together, "The Times") respectfully submit this memorandum of law in support of their motion pursuant to Federal Rule of Civil Procedure 12(b)(6) for an order dismissing plaintiff Dfinity Foundation's ("Dfinity") claims against The Times with prejudice.

## PRELIMINARY STATEMENT

On June 28, 2021, The Times published a brief news article reporting on the rapid rise and fall of a cryptocurrency known as ICP. The article recounted how ICP had, within a few weeks, gone from being one of the most valuable cryptocurrencies in the world to losing more than 90% of its value, raising many questions about what happened. The article quoted an analytics firm, Arkham Intelligence, Inc. ("Arkham"), detailing some factors that might have contributed to the collapse. It quoted Dfinity, ICP's creator, refuting those theories. And it quoted others in the industry suggesting ICP's collapse was just bad market timing. In short, the article was a straightforward piece of business journalism, similar to many others written about Dfinity.

A year later, Dfinity sued The Times and Arkham for defamation in a Complaint largely devoted to conspiracy theories about Arkham, which it claims is a front for shadowy international "elites" out to destroy Dfinity. These conspiracy theories are irrelevant to plaintiff's defamation claim against The Times. The article is not defamatory on its face, Dfinity's claims lack any basis in law, and all claims against The Times should be dismissed with prejudice.

## **BACKGROUND**

### I.    **DFINITY FOUNDATION**

As set out in the Complaint and documents of which the court may take judicial notice,[1] plaintiff Dfinity is a prominent not-for-profit organization best known for its development of what it calls "The Internet Computer." Compl. ¶ 5. The Internet Computer is a public blockchain platform that is designed to enhance the internet with a new form of server-less cloud functionality. *Id.* ¶¶ 4-5. As part of this work, on May 7, 2021 Dfinity launched its "own native cryptocurrency, the ICP utility token" ("ICP"). Compl. ¶ 5.

At its launch on May 10, 2021, the ICP token rocketed in value to trade for hundreds of dollars per token, making it one of the highest-valued cryptocurrencies in the world.[2] However, the price then began to fall rapidly. By June 28, 2021, the ICP token was valued at less than $40 USD.[3] Numerous organizations, analysts, and bloggers—particularly those specializing in cryptocurrency—reported on ICP's crash and speculated on the cause.[4]

---

[1] A court may properly take judicial notice of matters "generally known" or coming from sources "whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

[2] *See, e.g.*, *Internet Computer*, Crypto.com, https://crypto.com/price/internet-computer, last visited Sept. 16, 2022.

[3] *See, e.g.*, *id.* Dfinity's Complaint omits any information about the rise and fall of the ICP token's value. But Plaintiff cannot forestall by omission the court's consideration of this public information. *See Cortec Indus., Inc. v. Sum Holding L.P*, 949 F.2d 42, 44 (2d Cir. 1991) ("Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim - and that they apparently most wanted to avoid - may not serve as a means of forestalling the district court's decision on [a 12(b)(6)] motion.").

[4] *See, e.g.*, Matthew Makowski, *ICP Crypto: Is it Time to Buy Internet Computer Token at a Discount?* InvestmentU (June 2, 2021), https://investmentu.com/icp-crypto/; Sakshat Kolhatkar, *ICP Price Prediction: Will Internet Computer Recover Its ATH in The Coming Years?*, Republicworld (June 11, 2021), https://tinyurl.com/3cksv925; Muyao Shen, *Dfinity's ICP Token Now Down 95% in Nearly Two Months*, Coindesk (June 24, 2021), https://tinyurl.com/y3wmy9a8; J.P. Buntinx, *Internet Computer (ICP) Has Retraced 96% Since Its All-Time High*, Cryptomode (June 26, 2021), https://tinyurl.com/mrxr8k64; Yashu Gola, *Internet Computer (ICP) logs revenge recovery after crashing 95% since launch*, Cointelegraph.com (June 28, 2021), https://tinyurl.com/3ckjb69n; *ICP Crash: A Market*

2

## II.    ARKHAM INTELLIGENCE, INC.

Early in the morning on June 28, 2021, Arkham published a report analyzing ICP's rise and fall in value (the "Arkham Report"). Compl. ¶¶ 7-9; Decl. of Dana Green ("Green Decl.") Ex. B. Titled "Report On The Internet Computer Token," the report offers a detailed analysis of ICP's launch and price fluctuations. *Id.*; https://www.arkhamintelligence.com/reports/icp-report. The report sets out information Arkham obtained, Arkham's analytic process, and its "findings." Compl. ¶¶ 7-9. These include that "possible insiders connected to Dfinity have been dumping billions of dollars of ICP on exchanges at the expense of small early supporters and retail investors." *Id.*

## III.    THE ARTICLE

Later that day, on June 28, 2021, The Times published an article by reporters Andrew Ross Sorkin and Ephrat Livni, titled "The Dramatic Crash of a Buzzy Cryptocurrency Raises Eyebrows" (the "Article"). Compl. ¶ 10; Green Decl. Ex. A. The Article begins by describing Dfinity's prominent role, famous financial backers, and ambitious goals for the Internet Computer. Green Decl. Ex. A. It then explains how the ICP token gained and lost billions of dollars in value in a very short period of time and how "[t]he stunning climb and crash of this prominent project has market watchers puzzling about what happened — and who may have profited." *Id.*

The Article reports the views of one of those "market watchers," Arkham, which had shared the Arkham Report with The Times. *Id.* It quotes Arkham's founder saying the sudden

---

*Coincidence or Inside Job?*, CryptoTVPlus (July 10, 2021), https://tinyurl.com/ym9jt37m. The Court may properly take judicial notice of such news articles for the fact of their existence, rather than the truth of their contents. *See Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008).

loss in ICP's value is "highly unusual for a project of this scale" and this suggested "something

went wrong." *Id.* It then hyperlinks to the Report[5] and further quotes Arkham:

> The process for claiming ICP tokens stands out, because "Dfinity did not follow the playbook of other successful projects," Arkham said. "Instead, it appears they quietly allowed the treasury and insiders to send billions of dollars of ICP to exchanges, while making it extremely difficult for their longtime supporters to access the tokens they were promised."

> Arkham identified 44 "probable insider addresses" that deposited 10 million ICP tokens worth more than $2 billion to exchanges after the initial coin offering, giving the impression they were transferred for trading, not safeguarding. These transfers coincided with significant drops in the price of ICP, the report said. Small investors, left out of the process, were stuck.

> Dfinity gave late, complicated instructions for small investors who bought ICP tokens when they were very cheap in a 2017 crowdfunding round, Arkham said. The process was buggy and investors complained about limited customer support, according to the report. Mr. Morel, who co-founded Reserve, a cryptocurrency created for hyperinflationary economies, said that based on his experience with initial coin offerings, the Dfinity approach was unnecessarily complicated.

The Article then reports Dfinity's response to such criticisms:

> Dfinity said in a statement that bad actors on social media were undermining its project: "Day traders with alternative agendas and unethical crypto projects have used Reddit and Twitter to confuse the public." Dfinity said the initial supply of ICP was moved to a custody account at Coinbase, a big crypto exchange, for transfer to various categories of investors, many of whom "immediately transferred tokens" to avoid fees or "safeguard their ICP." Dfinity said that it was important "not to confuse transferring tokens from Coinbase Custody to other exchange wallets for safekeeping as 'selling' tokens."

> Dfinity also denied that the token claim process[6] for early investors was overly technical; the holders who had difficulties trading got the support they needed, the company said. Michael Lee, a Dfinity spokesman, said that the company was taking the "high road" and focusing on developing its Internet Computer project, noting that backers like Andreessen Horowitz remain committed.

---

[5] A true and correct copy of the Report is attached to the Green Decl. as Ex. B.
[6] The underlined text hyperlinks to ICP's own guide to the token claim process. Green Decl. Ex. C. The guide remains available online. Internet Computer Wiki, "How-To: Claim neurons for seed participants," https://wiki.internetcomputer.org/wiki/How-To:Claim_neurons_for_seed_participants.

*Id.* It then reports that other "industry observers say that the ICP crash was simply bad luck for a hyped project that happened to be listed just as extreme enthusiasm for crypto was waning." *Id.* The Article closes by comparing ICP's loss in value to that of the Shiba Inu Coin, "a joke coin" with no significant backing, which nevertheless "experienced less distress than the token underlying Dfinity's grand goals." *Id.* The Article remains available on The Times's website. Compl. ¶ 10; https://www.nytimes.com/2021/06/28/business/dealbook/icp-cryptocurrency-crash.html.

## IV. THE COMPLAINT

On June 27, 2022, Dfinity filed this action. Compl., ECF No. 1. The Complaint asserts a single count of defamation against The Times based on the Article. *Id.* ¶ 51. The Complaint purports to identify five actionable statements that, together, it claims accused "Dfinity, its founder Dominic Williams, and other 'insiders' of orchestrating a crypto scam" where insiders "sold their tokens early for an immense profit while small holders were unable to access their tokens and lost money." Compl. ¶¶ 34-35. These are:

> Statement 1: The project, years in the works, generated a lot of buzz last month ahead of its initial coin offering, the crypto equivalent of a company going public and listing shares for investors to buy.

> Statement 2: Even in the famously volatile crypto market, ICP stands out. The stunning climb and crash of this prominent project has market watchers puzzling about what happened—and who may have profited.

> Statement 3: Miguel Morel, the founder of Arkham Intelligence, a crypto analysis firm that followed the movements of ICP tokens on the blockchain, said that the price action and flaws in the coin offering process suggested "something went wrong."

> Statement 4: The process for claiming ICP tokens stands out, because "Dfinity did not follow the playbook of other successful projects," Arkham said. "Instead, it appears they quietly allowed the treasury and insiders to send billions of dollars of ICP to exchanges, while making it extremely difficult for their longtime supporters to access the tokens they were promised."

Statement 5: Arkham identified 44 "probable insider addresses" that deposited 10 million ICP tokens worth more than $2 billion to exchanges after the initial coin offering, giving the impression they were transferred for trading, not safeguarding. These transfers coincided with significant drops in the price of ICP, the report said. Small investors, left out of the process, were stuck.

*Id.* ¶ 35.

The Complaint also asserts claims for defamation and unfair business and trade practices against Arkham and sixteen individuals whom plaintiff claims are associated with the organization. Dfinity seeks unspecified damages in excess of $75,000, punitive damages, and "permanent injunctive relief" requiring the defendants to remove and not republish "statements adjudicated to be defamatory." *Id.* at 26.

## **LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U. S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U. S. 544, 570 (2007)). While the Court must accept the Complaint's factual allegations as true and draw reasonable inferences in Plaintiff's favor, *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007), the Court is not obligated to accept as true any legal conclusions couched as factual allegations. *Rolon v. Hennenman*, 517 F.3d 140, 148–49 (2d Cir. 2008); *see also Iqbal*, 556 U.S. at 678.

Robust application of the *Iqbal/Twombly* standard "has a 'particular value' in the defamation context," because "forcing defamation defendants to incur unnecessary costs can chill the exercise of constitutionally protected freedoms." *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013) (internal marks omitted). "In other words, in defamation cases, Rule 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Id.*

Dfinity's claim against The Times also constitutes an action involving public petition and participation under N.Y. Civil Rights Law § 76-a and is therefore subject to the provisions of the New York anti-SLAPP law. *See, e.g.*, *Sweigert v. Goodman*, No. 18 Civ. 8653 (VEC) (SDA), 2021 U.S. Dist. LEXIS 77704, at *1-4 (S.D.N.Y. Apr. 22, 2021).[7]

## ARGUMENT

Dfinity's Complaint fails to state any plausible claim: the Article is a brief and balanced piece of business journalism that is non-actionable on its face. The statements that Dfinity identifies as defamatory are plainly non-actionable opinion, lack defamatory meaning, and to the extent they convey facts, those facts are substantially true based on the Complaint itself. Moreover, Dfinity has not—and cannot—allege any facts that would demonstrate actual malice, as required by law.

## I.    THE STATEMENTS AT ISSUE ARE NON-ACTIONABLE OPINION

Dfinity's claims against The Times fail because, as a matter of law, the Article as a whole reports on and the specific statements at issue convey non-actionable opinion, entitled to protection by the First Amendment and New York law. *See, e.g.*, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–20 (1990); *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 286 (1986). In an effort to "provide[] a hospitable climate for the free exchange of ideas," New York grants even greater protection for opinion than federal law. *Weinstein v. Friedman*, 1996 U.S. Dist. LEXIS 3672, at

---

[7] While courts have concluded that several provisions of the law, such as its heightened pleading standard, conflict with the federal rules, other substantive provisions—in particular, the requirement that plaintiffs plead and prove actual malice—are not precluded. *See, e.g.*, *Carroll v. Trump*, ---F. Supp. 3d ----, 2022 U.S. Dist. LEXIS 43512, (S.D.N.Y. Mar. 10, 2022); *Kesner v. Buhl*, No. 20-cv-3454, 2022 U.S. Dist. LEXIS 43094 (S.D.N.Y. Mar. 10, 2022). Other courts have held that the heightened pleading standard and fee-shifting provisions do apply in federal court. *See, e.g.*, *Harris v. Am. Accounting Ass'n*, No. 20-cv-1057, 2021 U.S. Dist. LEXIS 226517, at *36 (N.D.N.Y. Nov. 24, 2021) (awarding attorney's fees); *Goldman v. Reddington*, No. 18-cv-3662, 2021 U.S. Dist. LEXIS 171340, at *13 (E.D.N.Y. Sept. 9, 2021) (applying heightened pleading standard and permitting counter-claim for fees).

*57-58 (S.D.N.Y. Mar. 26, 1996); *see also Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 249 (1991); *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 (2d Cir. 2013) ("New York law is, if anything, more protective of free speech interests and less expansive in permitting causes of action based on speech, than federal law").

Whether a statement constitutes a protected opinion is a question of law, appropriately decided on a motion to dismiss. *Mann v. Abel*, 10 N.Y.3d 271, 276 (2008). In making this evaluation, courts in New York look to "the content of the whole communication, its tone and apparent purpose." *Immuno AG*, 77 N.Y.2d at 254. A court's analysis is guided by four factors: (1) "whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous"; (2) "whether the statement is capable of being objectively characterized as true or false"; (3) "the full context of the communication in which the statement appears"; and (4) "the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." *Celle v. Filipino Reporter Enters.*, 209 F. 3d 163, 178–79 (2d Cir. 2000) (quoting *Steinhilber*, 68 N.Y.2d at 292). This is not "a rigid set of criteria" and the weight accorded to those factors may vary by context. *Steinhilber*, 68 N.Y.2d at 291.

Applying these principles to the first three statements at issue, it is clear that analogizing a coin launch to a stock IPO, describing the ICP token as a "stunning climb and crash," or characterizing the reaction of "market watchers" as "puzzling about what happened" are all statements of opinion. Compl. ¶ 35(a)-(c). So are statements four and five, attributed to Arkham. *Id.* ¶ 35(d)-(e). The Article presents Arkham as one of those "market watchers" who were "puzzling" over events, describing it as an "analysis firm" that had published "an analysis" and

its leader as the co-founder of another cryptocurrency. Green Decl. Ex. A. Arkham's statements are immediately rebutted by statements from Dfinity and other "industry observers," proffering a different explanation for events. *Id.* This context signals to readers that they are encountering competing, subjective views on events. The qualified language in Arkham's quotations reinforces that impression: events "suggested" that "something went wrong," it "appears" Dfinity did things, there were "probable" insider addresses, events "give the impression." *Id.*

The Article also discloses the bases for Arkham's statements, by describing public information about ICP's rise and fall, quoting Arkham's explanations for its assertions, and by hyperlinking to the Arkham Report, where readers could examine Arkham's underlying research and form their own conclusions. As such, the statements are opinions based on disclosed facts— and not actionable. *See, e.g.*, *Biro v. Condé Nast*, 883 F. Supp. 2d 441, 461 (S.D.N.Y. 2012) ("A statement of 'pure opinion' is one which is . . . 'accompanied by a recitation of the facts upon which it is based' or 'does not imply that it is based upon undisclosed facts.'" (quoting *Steinhilber*, 68 N.Y.2d 283); *Levin v McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) (statement is not actionable if it discloses facts on which it is based); *Biro v. Condé Nast*, 2014 U.S. Dist. LEXIS 139065, at *9-10 (S.D.N.Y. Sept. 29, 2014) (where website linked to reports that provided research underpinning statements, they were "opinion based on disclosed facts" and not actionable).

Dfinity is not the first plaintiff to pursue a defamation claim over an unfavorable financial analysis. But courts in this jurisdiction have repeatedly held that investment advice and market analysts' reports – analyses that are essential to the operation of open markets and investor decision-making – are non-actionable opinion, as are quotations from them in news articles. *See, e.g.*, *Mimedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, No. 17-CV-07568 (PGG) (KHP), 2018 U.S.

9

Dist. LEXIS 28026, at *18-19 (S.D.N.Y. Jan. 12, 2018) (collecting cases); *Yangtze River Port & Logistics Ltd. v. Hindenburg Research*, No. 150721/2019, 2020 N.Y. Misc. LEXIS 877, at *16 (N.Y. Sup. Ct. Feb. 25, 2020) (collecting cases) ("[C]ourts frequently determine that investment analysis, such as that presented in the Report, constitutes the author's opinion.").

For example, in *Cummins v. Suntrust Capital Markets, Inc.*, the plaintiff brought a defamation claim after analyst reports suggested his stock option grants were timed to exploit insider information and media organizations (including The New York Times) reported on the analyst's allegations. 649 F. Supp. 2d 224, 233-35 (S.D.N.Y. 2009), *aff'd* 416 F. App'x 101 (2d Cir. 2011). The court found that the reports were not defamatory for multiple reasons, including that they constituted opinion based on disclosed facts. *Id.* In *Cummins* and other similar decisions, courts reaffirmed the importance of freedom of expression in this context. As one court put it, "defamation law cannot be used to deter 'would-be critics' from voicing their criticism as there is 'a need for information concerning the stock market in general or the successes, failures or manipulations of specific corporations in which thousands of people have invested their personal fortunes.'" *Mimedx*, 2018 U.S. Dist. LEXIS 28026, at *19 (quoting *Fotochrome, Inc. v. New York Herald Tribune, Inc.*, 61 Misc. 2d 226 (N.Y. Sup. Ct. 1969). These principles compel the same result here. On this basis alone, Dfinity's claims against The Times should be dismissed with prejudice.

## II.    THE ARTICLE LACKS DEFAMATORY MEANING

Dfinity's claims against The Times also fail because the Article does not convey a defamatory meaning. Words are not defamatory unless they "arouse in the mind of the average person in the community an evil or unsavory opinion or expose plaintiff to public hatred, contempt, or aversion." *Pritchard v. Herald Co.*, 120 A.D.2d 956, 956 (4th Dep't 1986); *see also Celle*, 209 F.3d at 177. "Discomfort or affront" is not enough and "[n]ot all (or even most)

maligning remarks can be considered defamatory." *Chau v. Lewis*, 771 F.3d 118, 127 (2d Cir. 2014). Instead, the words must "attribute[ ] odious or despicable characterizations to its subject." *Id.*

This determination is appropriately made at the pleading stage. *See, e.g.*, *Jacob v. Lorenz*, No. 21-cv-06807-ER, 2022 U.S. Dist. LEXIS 161822 (S.D.N.Y. Sept. 7, 2022); *Jacobus v. Trump*, 156 A.D.3d 452, 453 (1st Dep't 2017). In making this determination, "[c]hallenged statements are not to be read in isolation, but must be perused as the average reader would against the whole apparent scope and intent of the writing." *Celle*, 209 F.3d at 177 (internal marks omitted).

Here, Dfinity argues that The Times accused Dfinity of "executing a crypto scam" where insiders "sold their tokens early for an immense profit while small holders were unable to access their tokens and lost money." Compl. ¶ 34.[8] Those words do not appear in the Article, and The Times reached no such conclusions. It reported on indisputably true facts—that the ICP token had rapidly gained and lost value—and then presented competing theories about the dynamics at play. *See* Green Decl. Ex. A. Some of those theories, proffered by Arkham, were critical of Dfinity. But Arkham's theories were appropriately presented as one analyst's allegations, readers immediately were offered Dfinity's rebuttal, and the Article also offered a third alternative explanation that Dfinity was just the victim of market timing. *Id.* A reasonable reader would view the Article as succinctly presenting competing arguments on an unresolved matter of public debate. Courts in similar circumstances have held that such reporting, as a whole, lacks

---

[8] The Complaint also describes the Article has having "falsely accused Dfinity of . . . 'driving a massive crash in the price of ICP. When considering the dollar amounts involved, it might come to be viewed as one of the biggest financial controversies ever.'" Compl. ¶ 36(a). The quoted language appears in the Arkham Report, not the Article, and there does not appear to be any basis for attributing it to The Times.

defamatory meaning. *See, e.g.*, *Croce v. New York Times Co.*, 930 F.3d 787, 794-95 (6th Cir. 2019) (article that presented competing allegations and defenses regarding potential academic wrongdoing, without treating the allegations as true, lacked defamatory meaning); *Fairfax v. CBS Broad., Inc.*, 534 F. Supp. 3d 581, 593-95 (E.D. Va. 2020) (report on allegations of sexual assault lacked defamatory meaning where broadcaster did not adopt the allegations as true and included rebuttals), *aff'd on other grounds*, 2. F.4th 286 (4th Cir. 2021); *Ramsey v. Fox News Network, L.L.C.*, 351 F. Supp. 2d 1145, 1152 (D. Colo. 2005) (article presenting both allegations and exculpatory facts regarding the family of JonBenet Ramsey lacked defamatory meaning); *Gorilla Coffee, Inc. v. N.Y. Times Co.*, 936 N.Y.S.2d 58, 58 (N.Y. Sup. Ct. 2011) (report on labor dispute lacked defamatory meaning where it "did not state or imply one side's position to be factual or more credible than the other.").

But even viewed individually, many of the first three statements at issue lack defamatory meaning on their face. Statement 1 explains, in layman's terms, that the ICP token began trading publicly the month before. Compl. ¶ 35(a). The Complaint confirms this is true. *See, e.g.*, *id.* ¶¶ 6 (referring to the ICP token "release" in May 2021), 29 ("In May 2021 [Dfinity] . . . "launched its much-anticipated network and ICP utility token"), 36 (describing the launch and mechanics of the token's release). Dfinity apparently argues that the phrase "initial coin offering" suggests illegality. *See id.* ¶ 10 ("the statement "falsely claims that Dfinity engaged in an *illegal* 'initial coin offering'"); *id.* ¶ 36(a). But nothing in the Article supports that implication and an initial coin offering is a common and lawful activity.

Statement 2 observes that ICP's rise and fall "stands out" and that it left "market watchers puzzling about what happened—and who may have profited." *Id.* ¶ 35(b). Statement 3 similarly quotes Mr. Morel speculating that "something went wrong." *Id.* ¶ 35(c). And Statement

4 quotes Mr. Morel asserting that "Dfinity did not follow the playbook of other successful projects." As set out above, these statements are non-actionable opinion. But they also lack defamatory meaning. It is not defamatory to report that questions are being asked. *See, e.g.*, *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1338-39 (D.C. Cir. 2015) (collecting cases). Open-ended speculation that "something went wrong" is so vague as to lack any concrete defamatory meaning—and seems only to reflect the obvious: that the ICP token crashed. And whether or not Dfinity "followed the playbook" of more successful projects is both opinion and not the kind of statement capable of subjecting the plaintiff to the kind of hatred and ridicule that the law requires.

## III.    THE STATEMENTS AT ISSUE ARE SUBSTANTIALLY TRUE

Dfinity's claims also fail because many of the statements are "substantially true" as a matter of law. *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 302 (2d Cir.1986) (A statement is not defamatory if it is "substantially true" and plaintiff bears the burden of proving falsity). "Substantial truth" does not mean forensic accuracy. *Id.* at 302. Rather, the First Amendment and New York law protect a speaker from liability so long as the contested statements carry the same "gist" or sting as the pleaded truth. *See, e.g.*, *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 242 (2d Cir. 2017) (a statement is "substantially true" if it "would not have a different effect on the mind of the reader from that which the pleaded truth would have produced."); *Printers II, Inc. v. Prof'ls Publ'g, Inc*., 784 F.2d 141, 146 (2d Cir. 1986).

Here, the Complaint itself demonstrates the truth of statements four and five. The Complaint states, for example, that at the time of the ICP launch, Dfinity put 26% of the total ICP tokens (worth potentially billions of dollars) into a Coinbase wallet and then transferred the tokens to "early contributors, seed donors, strategic partners, former team members, etc." Compl. ¶ 36(c). "Many" of those accounts then "immediately transferred tokens to another exchange

13

wallet." *Id.* Similarly, the Article quoted Arkham stating that Dfinity "allowed the treasury and insiders to send billions of dollars of ICP to exchanges" and "probable insider addresses" "deposited 10 million ICP tokens . . . to exchanges after the initial coin offering." *Id.* ¶ 35(d)-(e). The distinction Dfinity apparently draws is that it believes the transfers were for "safekeeping" rather than sale and that groups such as "former team members" or "strategic partners" should not be characterized as "insiders." *See id.* ¶ 36(c). But Arkham and Dfinity appear to be conveying substantially the same facts, viewed through different lenses.

Similarly, Dfinity asserts it was false for the Article to quote Arkham saying it was "extremely difficult for their longtime supporters to access the tokens they were promised" or that "[s]mall investors, left out of the process, were stuck." *Id.* 35(d)-(e). Both of those statements referred to the "late, complicated instructions for small investors who bought ICP tokens when they were very cheap in a 2017 crowdfunding round." Green Decl. Ex. A. But the Complaint itself concedes the 2017 seed participants had limited access to their tokens via a complex process: "seed investors had their allocations locked in neurons which dissolved monthly—a fact Dfinity publicly disclosed on May 10, 2021." *Id.* ¶ 36(f). The Article hyperlinked to Dfinity's description of that process. *See* Green Decl. Ex. C (Internet Computer Wiki, *How To: Claim neurons for seed participants*, https://wiki.internetcomputer.org/wiki/How-To:_Claim_neurons_for_seed_participants). Again, the substance of Arkham's quoted statement does not substantially differ from the facts alleged in the Complaint—and certainly not in ways that would give rise to liability under the First Amendment.

**IV.    DFINITY HAS NOT PLAUSIBLY PLED THAT THE TIMES ACTED WITH ACTUAL MALICE**

Finally, Dfinity's claims fail because it has not and cannot show that the Article was published with "actual malice." Dfinity is required to plead actual malice by New York's anti-SLAPP statute. N.Y. Civ. Rights Law § 76–a. Dfinity also is required to plead actual malice as a matter of constitutional law because its own allegations show it is a public figure in the blockchain and cryptocurrency world: a prominent organization of "world-renowned scientists and engineers," working on a project to transform and revolutionize the global Internet and operating a crypto token once valued in the billions of dollars. Compl. ¶¶ 5, 29. *See, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974).

"Actual malice" is a legal term of art, meaning that the journalists who published the Article did so with knowledge that statements were false or despite a "high degree of awareness" of their "probable falsity." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989). *See also* N.Y. Civ. Rights Law § 76-a(2); *Palin v. New York Times, Co.*, 940 F.3d 804, 810 (2d Cir. 2019) ("'[T]he critical question is the state of mind of those responsible for the publication."). This showing must be made, even at the pleading stage, by pointing to "clear and convincing evidence." *Contemporary Mission, Inc. v. The New York Times Co.*, 842 F.2d 612, 621 (2d Cir. 1988). This "heavy burden of proof," *id.*, serves our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," even though such debate "may well include vehement, caustic, and sometimes unpleasantly sharp"—and even "erroneous"—commentary about public figures. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270–71 (1964).

Dfinity largely attempts to show actual malice by arguing The Times was in some way negligent: that it should have followed different journalistic practices, done more research, or

15

given Dfinity more time to answer questions. But negligence is not the Constitutional standard. None of these arguments are evidence of actual malice: that The Times journalists subjectively knew the statements at issue to be false.

For example, Dfinity argues that because Arkham was previously unknown, the authors of the Report "appear to be in their 20s," and Mr. Morel co-founded another cryptocurrency, The Times should have mistrusted their analysis. Compl. ¶¶ 3, 11-12. These arguments do not demonstrate that the Article was published with actual malice and fail even as a matter of logic. Lack of experience or youth does not mean an individual is lying. And analysts or commentators in many industries have ties to business in that industry; that does not make their observations or conclusions inherently false.

Dfinity similarly argues that The Times "consciously disregarded that Arkham was paid by an as-yet unidentified individual or individuals" to produce the Report. Compl. ¶ 3(d).But it is unclear how The Times could have ignored information that Dfinity itself apparently also has been unable to discover, or how the existence of a funder would make the report obviously false. *Id*. Similarly, Dfinity argues that The Times should have engaged in more rigorous vetting of Arkham, which "would have demonstrated that the Arkham Report was created for only one purpose: to cause reputational and financial damage to Dfinity." *Id.* ¶ 3(e). But, again, the Complaint itself points to no facts to support that claim—much less facts that The Times was aware of pre-publication.[9]

---

[9] Elsewhere in the Complaint, Dfinity points to information or events disclosed *after* publication as alleged evidence of Arkham's unreliability. *See, e.g.*, Compl. ¶¶ 12 (alleging the Arkham defendants "fled" to London), ¶¶ 13-14 (alleging a June 2022 sting video indicates a wealthy individual paid Arkham to make the Report). But events and information that occur after publication obviously cannot shape a journalist's state of mind prior to publication. *See, e.g.*, *Buttar v. Hearst Commc'ns, Inc.*, No. 21-cv-5566, 2022 U.S. Dist. LEXIS 74960, at *26 (N.D.

Dfinity also argues that The Times did not follow certain journalistic principles. Compl.

¶¶ 44-47. But it is well established that deviating from journalistic standards or internal policies

does not constitute actual malice. *See, e.g.*, *Harte-Hanks*, 491 U.S. at 665 ("[A] public figure

plaintiff must prove more than an extreme departure from professional standards" to demonstrate

actual malice); *Biro*, 963 F. Supp. 2d at 286 (failure to follow standards "even where it violates

the paper's practices as set forth in its employee handbook" does not establish actual malice)

(citation omitted).

Dfinity also argues The Times should have given Dfinity more opportunity to comment

(while also asserting that Dfinity did, in fact, provide "extensive' comments) and The Times

should have given greater credence to Dfinity's arguments. *See, e.g.*, Compl. ¶¶ 3(i)-(j), 32. But

the Complaint itself asserts that The Times did reach out to Dfinity in writing and by phone, *see*

*id*. ¶¶ 32, 36(b), and the Article then published Dfinity's response. These allegations "evince[ ]

appropriate regard for the truthfulness of the publication" rather than actual malice. *Jacob*, 2022

U.S. Dist. LEXIS 161822, at *38; *see also Cabello-Rondón v. Dow Jones & Co*., No. 16-cv-3346

(KBF), 2017 U.S. Dist. LEXIS 131114 (S.D.N.Y. Aug. 16, 2017) (attempts to interview plaintiff

and his supporters negated any inference of purposeful avoidance of the truth). And courts

repeatedly have held that, having sought plaintiff's comment, a journalist is not required to credit

it. Dfinity's denials, alone, cannot create actual malice. *See, e.g.*, *Edwards v. Nat'l Audubon*

*Soc'y, Inc.*, 556 F.2d 113, 121 (2d Cir. 1977) ("[S]uch denials are so commonplace . . . that, in

themselves, they hardly alert the conscientious [speaker] to the likelihood of error.").

---

Cal. Apr. 25, 2022) (email sent after publication of an article could not serve as a basis for
finding actual malice in the publication of the article).

In the end, Dfinity is unable to muster more than conclusory allegations that The Times's publication was "malicious" and supposition that Mr. Sorkin's work in television motivated him to publish false information. *See* Compl. ¶¶ 3(g), 3(j), 6, 54. Dfinity offers no reason why The Times and Mr. Sorkin would be hostile to Dfinity and, in any event, merely alleging that a defendant acted with ill will or an improper motive is insufficient to plead actual malice. *See Celle*, 209 F.3d at 183.

## <u>CONCLUSION</u>

For all the reasons set forth above, Defendant respectfully requests that the Court dismiss the Complaint with prejudice and provide such other and further relief as the Court deems appropriate.

Dated: New York, NY            Respectfully submitted,
      September 16, 2022

                                    */s/Dana R. Green*
                                    David E. McCraw
                                    Dana R. Green
                                    The New York Times Company
                                    Legal Department
                                    620 Eighth Avenue
                                    New York, NY 10018
                                    Phone: (212) 556-5290
                                    Facsimile: (212) 556-4634
                                    Email: dana.green@nytimes.com

                                    *Attorneys for Defendants The New York Times,*
                                    *Andrew Ross Sorkin, and Ephrat Livni*