**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
                                           )

DFINITY FOUNDATION,             )

                               )

                Plaintiff,     )  Case No. 1:22-cv-05418-LAK

                               )

      v.                       )

                               )  **ORAL ARGUMENT REQUESTED**

THE NEW YORK TIMES COMPANY, _et al._,  )

                               )

               Defendants.    )

_____)

 

**MEMORANDUM OF LAW IN SUPPORT OF THE ARKHAM DEFENDANTS'**
**<u>MOTION TO DISMISS THE COMPLAINT</u>**

Jeffrey A. Simes
Meghan K. Spillane
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
Tel.:   (212) 813-8800
Fax:   (212) 355-3333
jsimes@goodwinlaw.com
mspillane@goodwinlaw.com

_Attorneys for Defendants Arkham Intelligence, Inc., Miguel Morel, and Zachary Lerangis_

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ............................................................................................... 4

    A.    Cryptocurrency Has Attracted and Continues to Attract Interest from the Public At Large, Including Retail Investors. ............................................ 4

    B.    Arkham Intelligence Was Founded as a Tool for Blockchain Analysis in the Crypto Community. .......................................................................... 5

    C.    Following Its Public Launch, the Internet Computer Token Suffered a Catastrophic Freefall that Invited Public Scrutiny. .................................. 6

    D.    Arkham Joined the Public Discussion Regarding the ICP Token's Collapse with the Publication of the Arkham Report and Video. ........................... 8

ARGUMENT ................................................................................................... 10

I.    PLAINTIFF FAILS TO PLEAD A CLAIM FOR DEFAMATION BASED UPON THE CHALLENGED STATEMENTS IN THE ARKHAM REPORT AND VIDEO. ................................................................................................ 10

    A.    The Complaint Fails to Adequately Plead Actual Malice. .................... 11

        1.    The "Actual Malice" Standard Is Appropriate Here. .............................. 12

        2.    Plaintiff Fails to Establish "Actual Malice" of the Arkham Defendants. .......................................................................................... 14

    B.    The Challenged Statements Are Nonactionable Opinions. ................... 16

        1.    Plaintiff Does Not Challenge the Factual Bases for the Challenged Statements, Which Are Publicly Available and Not Refutable. ............. 18

        2.    The Challenged Statements Must Be Considered in the Context of the Arkham Defendants' Equivocal and Cautionary Language. ............. 19

    C.    The Challenged Statements Are Incapable of Defamatory Meaning. ................. 23

    D.    The Complaint Fails to Plead Special Damages for the Defamation Claim. ........ 25

        1.    The Challenged Statements Are Not Defamatory *Per Se*. ...................... 26

        2.    Plaintiff Fails to Plead Special Damages Arising from the Challenged Statements. .......................................................................... 28

II.    THE ARKHAM DEFENDANTS ARE NOT LIABLE FOR THE STATEMENTS PUBLISHED IN THE *TIMES* ARTICLE. ...................................................... 30

III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR A VIOLATION OF GENERAL BUSINESS LAW § 349. ............................................................. 32

CONCLUSION ................................................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aristocrat Plastic Surgery, P.C. v. Silva*,
    169 N.Y.S.3d 272 (N.Y. App. Div. 2022) ...............................................................13

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
    28 F.4th 343 (2d Cir. 2022) ..................................................................................1

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................................10

*Aviation Fin. Co. v. Chaput*,
    2015 WL 13203653 (S.D.N.Y. Mar. 12, 2015) ....................................................17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................10, 11

*Biro v. Conde Nast*,
    807 F.3d 541 (2d Cir. 2015)..................................................................................12

*Biro v. Conde Nast*,
    883 F. Supp. 2d 441 (S.D.N.Y. 2012)...................................................................19

*Biro v. Conde Nast*,
    963 F. Supp. 2d 255 (S.D.N.Y. 2013)...................................................................13

*Brantley v. Mun. Credit Union*,
    2021 WL 981334 (S.D.N.Y. Mar. 16, 2021) .......................................................29

*Brian v. Richardson*,
    660 N.E.2d 1126 (N.Y. 1995).........................................................................17, 21

*Brimelow v. N.Y. Times Co.*,
    2021 WL 4901969 (2d Cir. Oct. 21, 2021), *cert. denied*, 142 S. Ct. 1210
    (2022)....................................................................................................................11

*BYD Co. Ltd. v. VICE Media LLC*,
    2022 WL 598973 (2d Cir. Mar. 1, 2022)...............................................................1

*BYD Co. Ltd. v. VICE Media LLC*,
    531 F. Supp. 3d 810 (S.D.N.Y. 2021), *aff'd*, 2022 WL 598973 (2d Cir. Mar. 1,
    2022) ........................................................................................................... *passim*

*Carto v. Buckley*,
    649 F. Supp. 502 (S.D.N.Y. 1986).........................................................................21

*Cerasani v. Sony Corp.*,
    991 F. Supp. 343 (S.D.N.Y. 1998).........................................................................31

*Chaiken v. VV Publ'g Corp.*,
    907 F. Supp. 689 (S.D.N.Y. 1995), *aff'd*, 119 F.3d 1018 (2d Cir. 1997) ..............11

*Chau v. Lewis*,
    771 F.3d 118 (2d Cir. 2014).......................................................................22, 23, 25

*Chau v. Lewis*,
    935 F. Supp. 2d 644 (S.D.N.Y. 2013), *aff'd*, 771 F.3d 118 (2d Cir. 2014) ............18

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008).....................................................................16

*Coleman v. Grand*,
    523 F. Supp. 3d 244 (E.D.N.Y. 2021) ..............................................................13, 16

*Collins v. Travers Fine Jewels Inc.*,
    2017 WL 1184305 (S.D.N.Y. Mar. 29, 2017) .........................................16, 25, 28

*Croy v. A.O. Fox Mem'l Hosp.*,
    68 F. Supp. 2d 136 (N.D.N.Y. 1999) ......................................................................31

*Cummings v. City of N.Y.*,
    2022 WL 2166585 (2d Cir. June 16, 2022) .....................................................10, 16

*Cummins v. SunTrust Cap. Mkts., Inc.*,
    416 F. App'x 101 (2d Cir. 2011) .............................................................................20

*Cummins v. Suntrust Cap. Mkts., Inc.*,
    649 F. Supp. 2d 224 (S.D.N.Y. 2009), *aff'd*, 416 F. App'x 101 (2d Cir. 2011).....21

*Egiazaryan v. Zalmayev*,
    2011 WL 6097136 (S.D.N.Y. Dec. 7, 2011) ..........................................................31

*Eros Int'l, PLC v. Mangrove Partners*,
    140 N.Y.S.3d 518 (N.Y. App. Div. 2021) .................................................19, 20, 21

*Farber v. Jefferys*,
    2011 WL 5248207 (N.Y. Sup. Ct. Nov. 2, 2011), *aff'd*, 959 N.Y.S.2d 486
    (N.Y. App. Div. 2013) .......................................................................................12, 15

*Farber v. Jefferys*,
    959 N.Y.S.2d 486 (N.Y. App. Div. 2013) ..............................................................16

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
   1992 WL 170559 (S.D.N.Y. July 2, 1992) ...........................................................34

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
   314 F.3d 48 (2d Cir. 2002)..................................................................................30

*Fedak v. YIMBY, Inc.*,
   2018 WL 6697963 (S.D.N.Y. Dec. 20, 2018) .......................................................23

*Fleming v. Laakso*,
   2019 WL 959521 (S.D.N.Y. Feb. 5, 2019)............................................................30

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000)..................................................................................7

*Gentile v. Grand St. Med. Assocs.*,
   911 N.Y.S.2d 743 (N.Y. App. Div. 2010) .............................................................23

*Gibson v. SCE Grp., Inc.*,
   391 F. Supp. 3d 228 (S.D.N.Y. 2019)...................................................................16

*Global Auto, Inc. v. Hitrinov*,
   2021 WL 7367078 (E.D.N.Y. Aug. 20, 2021)........................................................28

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
   277 F. Supp. 2d 269 (S.D.N.Y. 2003)...............................................................32, 33

*Harty v. Nyack Motor Hotel Inc.*,
   2020 WL 1140783 (S.D.N.Y. Mar. 9, 2020) ...........................................................6

*Hayashi v. Ozawa*,
   2019 WL 1409389 (S.D.N.Y. Mar. 28, 2019) .......................................................17

*Hesse v. Godiva Chocolatier, Inc.*,
   463 F. Supp. 3d 453 (S.D.N.Y. 2020)....................................................................6

*Hodges v. Lutwin*,
   2022 WL 974386 (S.D.N.Y. Mar. 31, 2022) .........................................................15

*INV Accelerator, LLC v. MX Techs., Inc.*,
   2020 WL 882902 (S.D.N.Y. Feb. 24, 2020)..........................................................34

*Jones Real Est., Inc. v. Avatel Techs., Inc.*,
   2019 WL 1130154 (S.D.N.Y. Mar. 12, 2019) .......................................................35

*Karaduman v. Newsday, Inc.*,
   416 N.E.2d 557 (N.Y. 1980).................................................................................11

*Karedes v. Ackerley Grp., Inc.*,
   423 F.3d 107 (2d Cir. 2005).................................................................................23

*Kesner v. Buhl*,
   2022 WL 718840 (S.D.N.Y. Mar. 10, 2022) .................................................12, 13

*Kesner v. Dow Jones & Co.*,
   515 F. Supp. 3d 149 (S.D.N.Y. 2021)...................................................................30

*Kinsey v. N.Y. Times Co.*,
   991 F.3d 171 (2d Cir. 2021)...................................................................................10

*Kuan Sing Enters., Inc. v. T. W. Wang, Inc.*,
   446 N.Y.S.2d 76 (N.Y. App. Div. 1982) ..............................................................16

*LaFaro v. N.Y. Cardiothoracic Grp., PLLC*,
   570 F.3d 471 (2d Cir. 2009)...................................................................................10

*LBF Travel, Inc. v. Fareportal, Inc.*,
   2014 WL 5671853 (S.D.N.Y. Nov. 5, 2014) .........................................................32

*Liberman v. Gelstein*,
   605 N.E.2d 344 (N.Y. 1992)..................................................................................26

*Lindberg v. Dow Jones & Co.*,
   2021 WL 3605621 (S.D.N.Y. Aug. 11, 2021) .......................................................13

*Lindell v. Mail Media Inc.*,
   575 F. Supp. 3d 479 (S.D.N.Y. 2021)...................................................................24

*Lokai Holdings LLC v. Twin Tiger USA LLC*,
   306 F. Supp. 3d 629 (S.D.N.Y. 2018)...................................................................32

*Loughlin v. Goord*,
   558 F. Supp. 3d 126 (S.D.N.Y. 2021)...................................................................15

*Magnoni v. Smith & Laquercia, LLP*,
   701 F. Supp. 2d 497 (S.D.N.Y. 2010), *aff'd*, 483 F. App'x 613 (2d Cir. 2012).......................4

*Margolies v. Rudolph*,
   2022 WL 2062460 (E.D.N.Y. June 6, 2022) .........................................................23

*Marom v. Pierot*,
   2020 WL 6572509 (S.D.N.Y. Aug. 30, 2020).........................................28, 29, 30

*Mestecky v. N.Y.C. Dep't of Educ.*,
   791 F. App'x 236 (2d Cir. 2019) ...........................................................................25

iv

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*,
   2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018) ................................................................11

*Mirza v. Amar*,
   513 F. Supp. 3d 292 (E.D.N.Y. 2021) ..........................................................................13

*Moritz v. Town of Warick*,
   2017 WL 4785462 (S.D.N.Y. Oct. 19, 2017) ...............................................................26

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ......................................................................................................11

*NOVAGOLD Res., Inc. v. J Capital Rsch. USA LLC*,
   2022 WL 900604 (E.D.N.Y. Mar. 28, 2022) ................................................................21

*Pasqualini v. MortgageIT, Inc.*,
   498 F. Supp. 2d 659 (S.D.N.Y. 2007) ..........................................................................30

*Pfizer, Inc. v. Stryker Corp.*,
   2003 WL 21660339 (S.D.N.Y. July 15, 2003) .............................................................34

*Pisani v. Staten Island Univ. Hosp.*,
   2008 WL 1771922 (E.D.N.Y. Apr. 15, 2008) ..............................................................32

*Post v. Regan*,
   677 F. Supp. 203 (S.D.N.Y. 1988), *aff'd*, 854 F.2d 1315 (2d Cir. 1988) ...................16

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,
   813 F. Supp. 2d 489 (S.D.N.Y. 2011) ..........................................................................27

*Reilly v. Natwest Mkts. Grp. Inc.*,
   181 F.3d 253 (2d Cir. 1999) ..........................................................................................25

*Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*,
   2014 WL 4723299 (S.D.N.Y. Sept. 23, 2014) .............................................................33

*Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*,
   2016 WL 815205 (S.D.N.Y. Feb. 29, 2016) .................................................................13

*Sackler v. Am. Broad. Cos.*,
   144 N.Y.S.2d 529 (N.Y. Sup. Ct. 2021) ......................................................................14

*Shipman v. Charles Schwab & Co.*,
   2016 WL 11472831 (E.D.N.Y. Aug. 11, 2016) ..............................................................7

*Sorvillo v. St. Francis Preparatory Sch.*,
   607 F. App'x 22 (2d Cir. 2015) ....................................................................................18

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
   864 F.3d 236 (2d Cir. 2017)..............................................................................11

*Thai v. Cayre Grp., Ltd.*,
   726 F. Supp. 2d 323 (S.D.N.Y. 2010).............................................................26, 28

*USAlliance Fed. Credit Union v. CUMIS Ins. Soc'y, Inc.*,
   346 F. Supp. 2d 468 (S.D.N.Y. 2004)...............................................................35

*Valley Elecs. AG v. Polis*,
   2022 WL 893674 (2d Cir. Mar. 28, 2022).................................................11, 21, 22

*Van-Go Transp. Co. Inc. v. N.Y.C. Bd. of Educ.*,
   971 F. Supp. 90 (E.D.N.Y. 1997).......................................................................27

*Vitolo v. Mentor H/S, Inc.*,
   426 F. Supp. 2d 28 (E.D.N.Y. 2006), *aff'd*, 213 F. App'x 16 (2d Cir. 2007).........................34

*Wang v. Pataki*,
   396 F. Supp. 2d 446 (S.D.N.Y. 2005)..................................................................4

*Weiner v. Doubleday & Co.*,
   535 N.Y.S.2d 597 (N.Y. App. Div. 1988), *aff'd*, 549 N.E.2d 453 (N.Y. 1989)...............16, 20

*Weinstein v. Friedman*,
   1996 WL 137313 (S.D.N.Y. Mar. 26, 1996), *aff'd*, 112 F.3d 507 (2d Cir.
   1996) ...............................................................................................................24

*Wilson v. Tarricone*,
   2013 WL 12084504 (S.D.N.Y. Sept. 26, 2013), *aff'd*, 563 F. App'x 864 (2d
   Cir. 2014) .......................................................................................................30

*Zahrey v. City of N.Y.*,
   2009 WL 1024261 (S.D.N.Y. Apr. 15, 2009).......................................................30

*Zuber v. Bordier*,
   522 N.Y.S.2d 610 (N.Y. App. Div. 1987) ...........................................................21

**Statutes**

N.Y. Civ. Rights Law § 76-a(1)(a)(1)....................................................................12

N.Y. Civ. Rights Law § 76-a(2)........................................................................12, 14

N.Y. Gen. Bus. Law § 349......................................................................... *passim*

## Other Authorities

Oluwapelumi Adejumo, *What Is Reserve (RSV) Stablecoin?*, Coinspeaker (May 16, 2021), https://www.coinspeaker.com/guides/what-is-reserve-rsv-stablecoin/ ................................................................................................................5

Damanick Dantes & Frances Yue, *Market Wrap: Bitcoin in Recovery Mode Ahead of Options Expiry*, CoinDesk (June 24, 2021), https://www.coindesk.com/markets/2021/06/24/market-wrap-bitcoin-in-recovery-mode-ahead-of-options-expiry/ .................................................................7

Dfinity*, An Overview of the Internet Computer*, YouTube (July 8, 2020), https://www.youtube.com/watch?v=XgsOKP224Zw&t=2s ....................................................13

Jake Frankenfield, *Cryptocurrency Explained With Pros and Cons for Investment*, Investopedia (May 28, 2022), https://www.investopedia.com/terms/c/cryptocurrency.asp .......................................................4

Omkar Godbole & Bradley Keoun, *Dfinity's ICP Token Price Goes Live on Coinbase Pro*, CoinDesk (May 10, 2021), https://www.coindesk.com/markets/2021/05/10/dfinitys-icp-token-price-goes-live-on-coinbase-pro ...............................7

Tim Hakki, *Dfinity's ICP Cryptocurrency Has Been in Free Fall Since Launch*, Decrypt (June 11, 2021), https://decrypt.co/73347/dfinitys-icp-falls-another-10 ...............................................................................................................................................7

*Internet Computer*, CoinMarketCap, https://coinmarketcap.com/currencies/internet-computer/ (last visited Sept. 15, 2022).................................................9, 29

*Internet Computer Token Economics*, Internet Computer Academy, https://internetcomputer.academy/tokenomics/ (last visited Sept. 15, 2022) ..........................6

Muyao Shen, *Dfinity's ICP Token Now Down 95% in Nearly Two Months*, CoinDesk (June 24, 2021), https://www.coindesk.com/markets/2021/06/24/dfinitys-icp-token-now-down-95-in-nearly-two-months/ ....................................7

*What Is the ICP Token?*, Internet Computer Academy, https://internetcomputer.academy/icp-token/what-is-icp-token/ (last visited Sept. 15, 2022) .............................................................................................................6

Defendants Arkham Intelligence, Inc. ("Arkham Intelligence" or "Arkham"), Miguel Morel, and Zachary Lerangis (collectively, the "Arkham Defendants") move pursuant to Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss all of the claims against them in the Complaint (Dkt. No. 1) with prejudice.

## PRELIMINARY STATEMENT

When Dfinity's cryptocurrency (or "crypto") offering—the Internet Computer token ("ICP")—collapsed spectacularly in June of 2021, there was enormous public interest in what caused ICP to lose 95% of its value within two months of its initial offering. Arkham, a crypto analytics firm that plays an important role in the public discourse concerning cryptocurrencies such as ICP, analyzed transaction activity on the blockchain and the public statements by Dfinity and others to try to give investors insight into how Dfinity's crypto offering had gone so disastrously wrong. Arkham issued a report and corresponding video that summarized the facts assembled from the blockchain and other publicly-available sources and offered heavily caveated inferences as to what those facts might mean (the "Arkham Report" and "Arkham Video"). Arkham warned readers of the areas of possible uncertainty and limits to its analysis, but ultimately inferred from these public facts that "ICP's price collapse" was "possibly driv[en]" by the deposit activity of Dfinity and "suspected [Dfinity] insiders."[1] Arkham Report, at 5. The Arkham Report was then cited in a New York Times article (the "*Times* Article") as one among several sources regarding this market event.[2] Following these publications, the price of ICP actually went *up*, and ICP continued to increase in value over the month following.

---

[1] The Arkham Report defined "insiders" as those individuals with wallets "linked to the Treasury," who either received deposits from the Dfinity Treasury or sent tokens to deposit addresses also used by the Dfinity Treasury. *See* Spillane Decl. Ex. 3 (Arkham Report), at 4.

[2] The Court may consider the Arkham Report and the *Times* Article, as well as the Arkham Video, on a motion to dismiss because they are hyperlinked (Compl. ¶¶ 7, 9, 10) and also quoted (*id.* ¶¶ 35, 38, 40) in the Complaint, and therefore incorporated by reference. *See BYD Co. Ltd. v. VICE Media LLC*, 2022 WL 598973, at *3 n.4 (2d Cir. Mar. 1, 2022); *see also Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 n.3 (2d Cir. 2022)

One day prior to the expiration of the statute of limitations on its claim, Dfinity filed this lawsuit, seeking to punish the Arkham Defendants for contributing to an important public discourse and to discourage their further efforts to examine causes of volatility in the crypto space. Through the instant Complaint, Dfinity has spun an elaborate false narrative under which the Arkham Defendants conspired with unnamed "wealthy elites" and the New York Times to publish a "bought-and-paid for hit piece" whose sole purpose was "to cause reputational and financial damage to Dfinity and the Internet Computer Protocol." *See* Compl. ¶¶ 2, 3(e).  There is absolutely no merit to these allegations.[3]  Dfinity further claims—without offering any specifics—to have suffered "an enormous amount of direct monetary damage, and reputational and business harm" as a result of the Arkham Report and Arkham Video.  *Id.* ¶ 48.

Even crediting Dfinity's speculations as true for purposes of this motion, no viable claim is stated here.  *First*, Plaintiff fails to plead actual malice.  *Infra* Section I.A.  Although Plaintiff concedes that the actual malice standard applies to its claims, the Complaint fails to include any facts to suggest that Defendants knew that the information in the Arkham Report and Arkham Video was wrong, or had obvious reasons to doubt its accuracy.  As the Arkham Report makes clear, the facts on which it relies all come from Dfinity itself or the publicly-available blockchain data; it was thus incumbent upon Dfinity to explain how and why Arkham should have understood that these public sources were somehow inaccurate, yet Dfinity does no more than make a blanket and conclusory assertion of their falsity.  Given the Arkham Defendants' engagement on a matter

(observing that a document integral to the complaint that is "partially quoted therein may be incorporated by reference in full").  These cited materials are also annexed hereto as exhibits to the Declaration of Meghan K. Spillane in Support of the Arkham Defendants' Motion to Dismiss the Complaint, dated September 16, 2022 ("Spillane Decl.").

[3] Contrary to Plaintiff's baseless accusations, Arkham was not "founded and capitalized . . . to cause reputational damage to Dfinity and its investors."  (Compl. ¶ 12.)  Instead, Arkham was founded in January 2020, more than a year before the launch of Dfinity's ICP token and utilizes its technology to assist its customers and the general public in a variety of ways, as described further herein.

of public importance, Plaintiff must allege something more than mere animus towards Dfinity or intention to somehow interfere with Dfinity's business through this protected speech.

*Second*, the Complaint should be dismissed for the separate and independent reason that none of the allegedly defamatory statements are actionable. *Infra* Section I.B. Plaintiff does not challenge the factual bases for the allegedly defamatory statements, which are publicly available and not refutable, and the conclusions drawn from those factual predicates are nonactionable opinion because both the Arkham Report and Arkham Video include language that conveys to readers areas of possible uncertainty and limits to Arkham's analysis, include cautionary language, carry no precise meaning as used, and/or constitute hyperbole. Moreover, the Arkham Report read as a whole is not capable of having a defamatory meaning because it merely reflects Arkham's hypothesis regarding why the price of ICP dropped and does not expose Dfinity to public hatred, shame, ridicule, or similar feeling. *Infra* Section I.C.

*Third*, Plaintiff has not pleaded facts suggesting any special damages. *Infra* Section I.D. Although the Complaint elliptically implies that Arkham "injured" Dfinity by affecting the price of its ICP token, the allegations and judicially noticeable public materials show that that is simply not the case. The ICP token had lost 95% of its value *prior to* the issuance of the Arkham Report—indeed, the stated purpose of the Report was to investigate the collapse. After Arkham issued its findings, the price of the ICP token *increased*, gaining more than 50% in value in the two months following the Arkham Report. Even if a drop in price had followed the Arkham Report (which it did not), Dfinity offers no allegation that the drop in price affected Dfinity. Dfinity makes no allegation that it owned any ICP tokens, nor does it offer any other allegation to suggest how any impact on the token could have injured it. Nor does Dfinity allege any other specific injury that could support its claim.

Finally, the Arkham Defendants are not liable for the allegedly defamatory statements cited in the Complaint that are attributed to the *Times* Article because Plaintiff nowhere alleges that the Arkham Defendants were involved in, knew of, or foresaw the publication of those statements. *Infra* Section II.  And the Arkham Defendants are not liable under General Business Law § 349 because Plaintiff does not allege an injury to consumers as the statute requires.  *Infra* Section III.

For these reasons, the Complaint should be dismissed in its entirety, with prejudice.

## BACKGROUND

### A. Cryptocurrency Has Attracted and Continues to Attract Interest from the Public At Large, Including Retail Investors.

Cryptocurrency is a medium of exchange that exists digitally and allows transactions to be secured using cryptography, without the need for a centralized monetary authority such as a government or bank.  *See* Compl. ¶ 4.[4]  Generally speaking, crypto assets are created and disseminated using blockchain, which is a decentralized ledger that uses cryptography to process and verify transactions, allowing for the secure and reliable tracking of the ownership and transfer of each individual unit of a given asset.  *See id.*  Each crypto asset transaction on the blockchain becomes part of a permanent, indelible, and unalterable public history of all of the transactions that have occurred, although the transaction participants are only identified by an alphanumeric code rather than their underlying identities.  *See id.*

Current global market capitalization for crypto has reached over $2 trillion.[5]  Nonetheless,

---

[4] *See also, e.g.*, Jake Frankenfield, *Cryptocurrency Explained With Pros and Cons for Investment*, Investopedia (May 28, 2022), https://www.investopedia.com/terms/c/cryptocurrency.asp.  Courts routinely take judicial notice of "articles and Web sites published on the Internet," including at the motion to dismiss stage.  *Magnoni v. Smith & Laquercia, LLP*, 701 F. Supp. 2d 497, 501 (S.D.N.Y. 2010) (taking judicial notice of a brand name of a wheelchair in an employment dispute between former employee and former employer), *aff'd*, 483 F. App'x 613 (2d Cir. 2012); *see also Wang v. Pataki*, 396 F. Supp. 2d 446, 458 & n.2 (S.D.N.Y. 2005) (taking judicial notice on a motion to dismiss of information on a third party's website to demonstrate that the third party was "not similarly-situated" to plaintiffs in their Equal Protection challenge of New York's apartment information vendor law).

[5] Frankenfield, *supra* note 4. ("By November 2021, the aggregate value of all the cryptocurrencies in existence had reached over $2.1 trillion.").

there remains volatility and uncertainty in the crypto markets, particularly for retail investors who are new to the markets. *See* Arkham Report, at 1. Crypto assets remain highly volatile and subject to potential manipulation by bad actors, which can have a disproportionate impact on the retail investing public, who may lack the knowledge or strategies to recognize and adequately mitigate such risks. *See id.* at 13. Despite these uncertainties, crypto is and continues to be a rapidly-growing market, attracting interest from investors of all kinds, including first-time investors.

### B.    Arkham Intelligence Was Founded as a Tool for Blockchain Analysis in the Crypto Community.

Founded in 2020, Arkham Intelligence is a crypto analytics firm that helps the investing public understand and evaluate the crypto markets by analyzing and translating blockchain data. *See* Spillane Decl. ¶ 6 ("Arkham Video"). Arkham was founded by defendant Miguel Morel, an entrepreneur with years of experience in financial markets, technology, and crypto in particular. *See* Arkham Report, at 7.[6] Defendant Zachary Lerangis serves as Arkham's Head of Operations. Arkham's technology can connect anonymized (but otherwise publicly-available) crypto transaction activity on the blockchain to real world individuals and institutions, which can assist its individual clients as they seek to trace crypto assets that have been lost through theft or hacking. *See id.* at 2-5. Arkham also contributes to the public discourse and education regarding the crypto markets by engaging in post-mortem assessments of significant market events based on publicly-available information from blockchain transaction activity and other public sources (including statements from issuers themselves, like Dfinity). *See id.* at 2-13. Arkham publishes its investigative findings in comprehensive reports—citing to the source material—which lay out

---

[6] Before he founded Arkham in January 2020, Mr. Morel co-founded Reserve, a blockchain protocol launched in 2018 that allows individuals to create stablecoins backed by baskets of ERC-20 tokens on the Ethereum blockchain as a means of combatting hyperinflation. *See* Oluwapelumi Adejumo, *What Is Reserve (RSV) Stablecoin?*, Coinspeaker (May 16, 2021), https://www.coinspeaker.com/guides/what-is-reserve-rsv-stablecoin/.

potential root causes of such market events. *See id.* In this role, Arkham properly can be viewed as akin to an investigative journalist in the crypto space, providing the public with access to critical information to inform their investment decisions in these volatile markets. *See id.* at 13. Ultimately, Arkham's technology makes crypto markets healthier and more transparent by aggregating facts concerning cryptocurrency collapses that aid the public in understanding those markets. *See id.*

### C. Following Its Public Launch, the Internet Computer Token Suffered a Catastrophic Freefall that Invited Public Scrutiny.

The Dfinity Foundation developed the "Internet Computer Protocol," a project that purports to be a decentralized version of the Internet itself, displacing the need for centralized hosting services such as Amazon Web Services. *See* Compl. ¶ 5. Dfinity launched its own crypto currency called ICP to enable users "to participate in the ecosystem and to govern the blockchain network of the Internet Computer." *See id.*[7]

On May 10, 2021, Dfinity publicly launched the Internet Computer blockchain and issued a total of 496,213,709 ICP tokens to the public. *See* Compl. ¶ 29.[8] The ICP token quickly and spectacularly collapsed. Between 12:00 p.m. and 12:05 p.m. on May 10, 2021, the day of its launch, the ICP token was initially listed on secondary market trading platforms at approximately $700. By 2:25 p.m. that same afternoon, its value dropped nearly 60% to approximately $300. A

---

[7] *See also What Is the ICP Token?*, Internet Computer Academy, https://internetcomputer.academy/icp-token/what-is-icp-token/ (last visited Sept. 15, 2022). Courts routinely take judicial notice of a party's website at the motion to dismiss stage. *E.g.*, *Harty v. Nyack Motor Hotel Inc.*, 2020 WL 1140783, at *3 (S.D.N.Y. Mar. 9, 2020) (granting motion to dismiss after taking judicial notice of defendants' website); *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 463 (S.D.N.Y. 2020) ("for purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination" (citation and internal quotation marks omitted)).

[8] *See also Internet Computer Token Economics*, Internet Computer Academy, https://internetcomputer.academy/tokenomics/ (last visited Sept. 15, 2022).

month and a half later, on June 26, 2021, the value of ICP had further fallen to approximately $30—an astonishing 95% drop from its initial value.  *See* Arkham Report, at 1.[9]

The precipitous drop in the price of ICP over the month following its launch was the subject of intense public discussion and speculation.   On June 11, 2021, for example, one market participant observed that the ICP token "has been in free fall since launch," and posited that this is due to "competi[tion] with long-established blockchains that offer smart contracts and decentralized applications, like Cardano and Ethereum."[10]  Another commentator opined on June 24, 2021, that the ICP token was "launched during [] a boisterous market[, which] likely pushed initial valuation into upper range of expectations," and that "[a]s great as the tech is on paper, it is, to a large extent, unproven . . . there is little evidence of teams actively building on 'The Internet Computer.'"[11]   The same day, another industry participant remarked: "[w]ith prices retreating across the industry, the most recently hyped projects have been among those hardest hit. . . . In ICP's case, it seems the harder and faster it pumps, the more severe the dump."[12]

---

[9] *See also* Omkar Godbole & Bradley Keoun, *Dfinity's ICP Token Price Goes Live on Coinbase Pro*, CoinDesk (May 10, 2021), https://www.coindesk.com/markets/2021/05/10/dfinitys-icp-token-price-goes-live-on-coinbase-pro/. Courts regularly take judicial notice of the publicly-available price of other assets, such as stocks, at the motion to dismiss stage.  *See, e.g.*, *Ganino v. Citizens Utils. Co*., 228 F.3d 154, 166 n.8 (2d Cir. 2000) ("the district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment"); *Shipman v. Charles Schwab & Co.*, 2016 WL 11472831, at *6 (E.D.N.Y. Aug. 11, 2016) (taking judicial notice of publicized stock prices to determine if subject matter jurisdiction exists in lawsuit alleging violations of Sarbanes-Oxley, Dodd-Frank, several criminal statutes, and New York common law).

[10] Tim Hakki, *Dfinity's ICP Cryptocurrency Has Been in Free Fall Since Launch*, Decrypt (June 11, 2021), https://decrypt.co/73347/dfinitys-icp-falls-another-10.

[11] Muyao Shen, *Dfinity's ICP Token Now Down 95% in Nearly Two Months*, CoinDesk (June 24, 2021), https://www.coindesk.com/markets/2021/06/24/dfinitys-icp-token-now-down-95-in-nearly-two-months/.

[12] Damanick Dantes & Frances Yue, *Market Wrap: Bitcoin in Recovery Mode Ahead of Options Expiry*, CoinDesk (June 24, 2021), https://www.coindesk.com/markets/2021/06/24/market-wrap-bitcoin-in-recovery-mode-ahead-of-options-expiry/.

**D.    Arkham Joined the Public Discussion Regarding the ICP Token's Collapse with the Publication of the Arkham Report and Video.**

Following the ICP crash, and in the wake of the public concern regarding this market event, Arkham analyzed what had happened.  On June 28, 2021, in a thirteen-page report, Arkham published findings concerning the collapse in the price of ICP.  *See generally* Arkham Report.  The analysis was founded upon both publicly-available blockchain transaction data and off-chain public sources, which included primarily statements and disclosures from Dfinity itself.  The Arkham Report concluded that the precipitous decline in the price of ICP was "possibly driv[en]" by the deposit activity of Dfinity and "suspected [Dfinity] insiders."  *Id.* at 5.  The Arkham Report provided detailed analysis and cited to comprehensive data in support of its conclusions, including a listing of all launch-day deposits that Dfinity (the "Treasury") made directly to secondary market trading platforms (*id.* at 3); a description of deposits made by a representative "suspected [Dfinity] insider" (*id.* at 4); screenshots of Dfinity's complex token access instructions (*id.* at 10); and summaries and direct quotations from the questions and concerns raised by investors that still remain unanswered by Dfinity (*id.* at 8, 10-12).

Even where the Arkham Report's factual underpinnings all came from publicly available data (including Dfinity statements), the inferences drawn by the Arkham Report were both caveated and narrowly tailored to the publicly available facts.  For example, the Arkham Report refers to "'suspected" insider sales, and it repeatedly used qualifying language such as "[w]e believe," "[i]t appears that," and "[w]e suspect that" in conveying inferences that were reasonably drawn from public facts.  Arkham Report, at 4, 13.  Additionally, Arkham qualified that "[w]e do not have clear and direct evidence that these deposited tokens were sold," and that "[w]e must note that we cannot definitively say that ICP insiders carried out a pump-and-dump or a rug pull.  We do not have direct confirmation that the addresses in question belong to ICP insiders or the project

itself, or that the ICP tokens deposited to exchanges were sold." *Id.* at 5, 13.  Further, in the Arkham Video, Arkham cautioned viewers that "this is a private investigation based on our proprietary analysis and this video is not financial or legal advice."  *See* Arkham Video.  Finally, Arkham urged its viewers not to blindly accept its observations and conclusions, and instead to "do their own research and reach their own conclusions with the information we provide."  *Id.*

With hundreds of millions of dollars in investment value wiped out, the collapse of Dfinity's ICP token unsurprisingly attracted the attention of traditional media sources.  On the same day that the Arkham Report was published, the New York Times published an article, which cited to the Arkham Report among other sources and observed that "[t]he stunning climb and crash of [ICP] has market watchers puzzling about what happened—and who may have profited."  *See* Spillane Decl. Ex 2 (*Times* Article).  The *Times* Article noted that the "distress" that the ICP token experienced was a "serious matter."  *See id.*  After the issuance of the Arkham Report, Arkham Video, and *Times* Article, the value of the ICP token *increased*:  its value was $50.02 on June 27, 2021, rose to $54.07 the following day, and was $49.91 the day after.  Two months after the Report was published, on August 28, 2021, the value of ICP was up to $72.12.[13]

At no time between the publication of the Arkham Report and the filing of this lawsuit did Dfinity complain to Arkham about the Arkham Report, note any inaccuracy in it, or ask that it be amended or retracted.  Instead, on June 27, 2022—one year after the publication of the Arkham Report, Arkham Video, and *Times* Article—Plaintiff filed the instant lawsuit, bringing claims for defamation and unfair business and trade practices against the Arkham Defendants and others.  Plaintiff contends that twelve overlapping statements (the "Challenged Statements") are "100%

---

[13] All of these prices are publicly available on websites that track the price of crypto assets.  *See, e.g.*, *Internet Computer*, CoinMarketCap, https://coinmarketcap.com/currencies/internet-computer/ (last visited Sept. 15, 2022).

false and defamatory." Compl. ¶¶ 38-41.[14]  Plaintiff's claims are wholly without merit and instead constitute a bald attempt to chill the Arkham Defendants' speech concerning these matters of public importance, particularly matters that directly impact retail investors.

## ARGUMENT

## I.    PLAINTIFF FAILS TO PLEAD A CLAIM FOR DEFAMATION BASED UPON THE CHALLENGED STATEMENTS IN THE ARKHAM REPORT AND VIDEO.

Under New York law,[15] a defamation claim requires:  "(1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability."  *See Cummings v. City of N.Y.*, 2022 WL 2166585, at *3 (2d Cir. June 16, 2022).  To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must set forth "a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1960 (2007).  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id*. at 555 (alterations and internal quotation marks omitted).  And although a court must take "well-pleaded factual allegations" as true, mere legal conclusions "are not entitled to the assumption of truth."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009); *see also LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009) (same).

Importantly, because Plaintiff's claims unquestionably implicate the Arkham Defendants' First Amendment rights and important public interests, the Court must "consider th[e] case against

---

[14] Plaintiff further contends that an additional five statements in the *Times* Article are "false and defamatory."  Compl. ¶ 36.

[15] The Court should apply New York law because New York is the forum state and has the greatest factual nexus to the litigation.  *See Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176-78 (2d Cir. 2021); *see also* Compl. ¶¶ 20-24, 35 (alleging that the Times Defendants and the Arkham Defendants conducted business in New York, and that several of the Challenged Statements were made in a New York newspaper article).

the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 721 (1964). And because the "threat of being put to [the] defense of a lawsuit . . . may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself," *Chaiken v. VV Publ'g Corp.*, 907 F. Supp. 689, 695 (S.D.N.Y. 1995) (quoting *Karaduman v. Newsday, Inc.*, 416 N.E.2d 557, 563 (N.Y. 1980)), *aff'd*, 119 F.3d 1018 (2d Cir. 1997), courts routinely dispose of defamation cases at the earliest stage, where, as here, the threshold issues can be resolved by the court as a matter of law. *E.g.*, *Valley Elecs. AG v. Polis*, 2022 WL 893674, at *2 (2d Cir. Mar. 28, 2022) (affirming dismissal of defamation claim); *Brimelow v. N.Y. Times Co.*, 2021 WL 4901969, at *4 (2d Cir. Oct. 21, 2021) (same), *cert. denied*, 142 S. Ct. 1210 (2022); *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236 (2d Cir. 2017) (same).

In the instant case, Plaintiff has "not nudged [its] claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, nor can its defects be remedied. The statements attributed to the Arkham Defendants, in context, do not demonstrate "actual malice," are not defamatory, are not libel *per se*, and have caused no special damages. Particularly in light of the important First Amendment interests at issue here, this Complaint should be dismissed in its entirety, with prejudice.

### A.    The Complaint Fails to Adequately Plead Actual Malice.

Plaintiff's claims fail because the Complaint comes nowhere close to meeting the exacting standard of alleging "actual malice." Dfinity issued its ICP token to the public, and the collapse of that token was a public event; Arkham's reporting on that public event was an act of public participation, making the "actual malice" standard applicable here. Thus, Plaintiff had to allege with "clear and convincing evidence" (*MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, 2018 WL

4735717, at *8 (S.D.N.Y. Sept. 29, 2018) (citation omitted)) that each Challenged Statement "was made with knowledge of its falsity or with reckless disregard of whether it was false." N.Y. Civ. Rights Law § 76-a(2); *see also BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 818 (S.D.N.Y. 2021), *aff'd*, 2022 WL 598973 (2d Cir. Mar. 1, 2022). That is, Plaintiff had to allege facts to show Defendants' "subjective doubts about the truth of the publication," *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) (citation omitted), as "even spite, hostility or deliberate intention to harm is insufficient to show malice," *Farber v. Jefferys*, 2011 WL 5248207, at *11 (N.Y. Sup. Ct. Nov. 2, 2011) (citation and internal quotation marks omitted), *aff'd*, 959 N.Y.S.2d 486 (N.Y. App. Div. 2013). In the instant case, the Complaint merely impugns the motives of Defendants and asserts that the Challenged Statements are false without explaining how or why, much less offering some factual basis to suggest that Defendants knew the statements to be false or recklessly disregarded whether they were false. This does not meet the actual malice standard.

### 1.    The "Actual Malice" Standard Is Appropriate Here.

Plaintiff rightly concedes that "actual malice" is the appropriate standard by which to evaluate the Challenged Statements. *See* Compl. ¶¶ 18, 52. The actual malice standard applies because this is an action "involving public petition and participation," defined to include a claim based upon "any communication in a place open to the public or a public forum in connection with an issue of public interest." N.Y. Civ. Rights Law § 76-a(1)(a)(1), 76-a(2). Here, the Arkham Report and Arkham Video were published on a quintessentially public forum—the Internet. *See Kesner v. Buhl*, 2022 WL 718840, at *5-6 (S.D.N.Y. Mar. 10, 2022). Moreover, they were made "in connection with an issue of public interest," which includes "matters of political, social, or other concern to the community, even those that do not affect the general population," because they discussed a public blockchain project and the precipitous drop in value of its native token, the ICP, which particularly affects the community of investors who held the ICP token, including

"retail investors who bought ICP on Coinbase or other major crypto exchanges [and] lost millions if not billions of dollars." Arkham Report, at 1; *see Kesner*, 2022 WL 718840, at *10 (alterations, citation, and internal quotation marks omitted). Indeed, the Arkham Defendants published the Arkham Report and Arkham Video because they felt that "[i]nvestors deserve an explanation" regarding the serious drop in value of the ICP token, to "illuminat[e] some activity surrounding ICP and the organization behind it, Dfinity." Arkham Report, at 1. Courts have found similar topics to be issues of public interest warranting application of the "actual malice" standard.[16]

Moreover, Plaintiff is a limited purpose public figure, as Dfinity and its principals have "thrust [themselves] to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Coleman v. Grand*, 523 F. Supp. 3d 244, 256 (E.D.N.Y. 2021) (citation omitted); *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 274 (S.D.N.Y. 2013). Dfinity admits as much in the Complaint when it states that its vision was to "transform[] the public internet with the world's first web-speed, internet-scale public blockchain." Compl. ¶ 29. Dfinity injected itself into the public eye with its public offering, which was part of a publicly touted effort to "lead[] this movement"[17] towards rebuilding the internet ecosystem. Courts routinely apply the "actual malice" standard to plaintiffs who hold themselves out as limited purpose public figures in similar circumstances.[18]

---

[16] *See, e.g.*, *Kesner*, 2022 WL 718840, at *10 (statements accusing plaintiff of "participating or aiding in financial fraud" constituted an issue of public interest); *Lindberg v. Dow Jones & Co.*, 2021 WL 3605621, at *8 (S.D.N.Y. Aug. 11, 2021) ("reports of improper business practices, particularly where such conduct may result in loss to stakeholders," was a matter of public interest); *Aristocrat Plastic Surgery, P.C. v. Silva*, 169 N.Y.S.3d 272, 275 (N.Y. App. Div. 2022) (observing that "business reviews are of the public interest").

[17] Dfinity, *An Overview of the Internet Computer*, YouTube (July 8, 2020), https://www.youtube.com/watch?v=XgsOKP224Zw&t=2s.

[18] *See, e.g.*, *BYD*, 531 F. Supp. 3d at 819 (dismissing defamation claim after finding that BYD, producer and supplier of electric vehicles, solar panels, lithium batteries, and protective masks and equipment, is a limited-purpose public figure because of "its public role in the distribution of needed supplies in the COVID-19 crisis"); *see also Mirza v. Amar*, 513 F. Supp. 3d 292, 300 (E.D.N.Y. 2021) (same, for a medical practice and its operating physician); *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 2016 WL 815205, at *9 (S.D.N.Y. Feb. 29, 2016) (same, for a

2.    <u>Plaintiff Fails to Establish "Actual Malice" of the Arkham Defendants.</u>

The Complaint lacks any plausible, non-conclusory facts demonstrating that the Challenged Statements in the Arkham Report or Video were made with actual malice—*i.e.*, "with knowledge of its falsity or with reckless disregard of whether it was false," which warrants dismissal in this case.  *See* N.Y. Civ. Rights Law § 76-a(2); *BYD*, 531 F. Supp. 3d at 818 (same); *see also Sackler v. Am. Broad. Cos.*, 144 N.Y.S.2d 529, 534 (N.Y. Sup. Ct. 2021).  The Arkham Defendants name their sources, which are publicly available, and the Arkham Report includes links to those sources throughout the publication for anyone to review, verify, and determine for themselves whether they agree with the conclusions drawn therefrom.  *E.g.*, Arkham Report, at 6-7, 10.  No allegation suggests that any Defendant had any reason to doubt the accuracy of these public sources.  This severely undermines the position that the Arkham Defendants fabricated their position with knowledge that their analysis—or the factual underpinning of the analysis—was false.  *Cf. BYD*, 531 F. Supp. 3d at 822 ("a plaintiff may plausibly plead actual malice by alleging that a story was fabricated by the defendant if the defendant provides no source for the allegedly defamatory statements" (alterations, citation, and internal quotation marks omitted)).

The Complaint does not credibly assert otherwise.  Instead, in support of its claim that the Arkham Defendants acted with purported "actual malice," Plaintiff merely impugns Arkham and its motives, hypothesizing that the Arkham Report was "secretly bought and paid for by the wealthy elites," was a "bought-and-paid for hit piece," and was "created for only one purpose:  to cause reputational and financial damage to Dfinity and the Internet Computer Protocol."  *See* Compl. ¶¶ 2, 3(e).  Plaintiff offers no factual allegations to support these suppositions—which are,

_____

hair removal company).

in any event, untrue—and courts routinely disregard such conclusory allegations as insufficient to support a finding of actual malice. *E.g.*, *Hodges v. Lutwin*, 2022 WL 974386, at *2 (S.D.N.Y. Mar. 31, 2022) (no actual malice based on conclusory allegations that defendants "acted with malice and sought to destroy the [p]laintiffs' reputations"(internal quotation marks omitted)); *see also Farber*, 2011 WL 5248207, at *11 ("even spite, hostility or deliberate intention to harm is insufficient to show malice" (citation and internal quotation marks omitted)). In any event, these conclusory aspersions against Arkham provide no basis to plausibly infer that Arkham had reason to believe that the public sources it cited were in any way inaccurate.

Plaintiff's reliance on the Arkham Defendants' purported lack of public profile, affiliation with other blockchain projects, or alleged angel investors[19] similarly fail to satisfy the "actual malice" standard, as none of these allegations (which in any event are false) goes to the heart of the actual malice inquiry—that is, whether the Arkham Defendants knew that the information in the Arkham Report and Arkham Video was wrong or had obvious reasons to doubt its accuracy. *See BYD*, 531 F. Supp. 3d at 822. Courts routinely find complaints with similarly attenuated allegations insufficient to state a plausible claim for actual malice. *E.g.*, *Hodges*, 2022 WL 974386, at *2, *5 (no actual malice based on allegations that defendants "were competitors of [p]laintiffs," based on "a speculative interpretation of the Instagram conversation and [defendant's] email"); *Loughlin v. Goord*, 558 F. Supp. 3d 126, 154 (S.D.N.Y. 2021) (no actual malice where plaintiffs alleged facts to show "motive to defame" because plaintiff "had taken a position adverse to [defendant's] friend and colleague . . . when [plaintiff] made a whistleblower

---

[19] Compl. ¶ 3. Plaintiff's reliance on the "online investigative video footage posted on Crypto Leaks" from June 2022, does not help it meet its pleading standard. *Id.* ¶¶ 13-14. Setting aside any issues with the reliability of this anonymous source that appears to target perceived adversaries of Dfinity with unauthorized surveillance footage, for the purposes of this motion, all this footage shows (even if true) is that Arkham had an "angel" investor funding it. That does not tend to show actual malice—either that the Arkham Defendants knew that the information in the Arkham Report and Video was wrong, or that there were obvious reasons to doubt its accuracy. *See BYD*, 531 F. Supp. 3d at 822.

complaint against [him]").  Here, Plaintiff's attempts to string together a series of attenuated, conclusory allegations regarding actual malice is no greater than the sum of its parts.  Plaintiff's claim that "zero plus zero plus zero plus zero plus zero adds up to something" should be rejected.  *See City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008).  Absent a factual showing that the Arkham Defendants *knew* the information in the Arkham Report and Arkham Video was wrong, or that there were *obvious reasons to doubt* its accuracy, Plaintiff's claim fails.  *See BYD*, 531 F. Supp. 3d at 822; *see also Gibson v. SCE Grp., Inc.*, 391 F. Supp. 3d 228, 254-55 (S.D.N.Y. 2019) (same).[20]

### B.    The Challenged Statements Are Nonactionable Opinions.

Even if Plaintiff could show actual malice (it cannot), none of the Challenged Statements can form the basis of a defamation claim.  It is a fundamental principle under the First Amendment that a defamation claim must be based on statements of fact, not expressions of opinion.  *See Kuan Sing Enters., Inc. v. T. W. Wang, Inc.*, 446 N.Y.S.2d 76, 77 (N.Y. App. Div. 1982).  "Expressions of opinion . . . are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation."  *Cummings*, 2022 WL 2166585, at *3 (citation omitted); *see also Collins*

---

[20] Even if the actual malice standard did not apply, the Complaint fails to plead that the Arkham Defendants acted with the "gross irresponsibility" required for statements about "matters of public concern."  *Coleman*, 523 F. Supp. 3d at 254.  Plaintiff fails to plead facts showing that the Arkham Defendants acted in a grossly irresponsible manner: the Arkham Defendants summarized their detailed findings in a 13-page report, carefully described the analysis and data relied upon to get to those findings, identified their publicly available sources and included links to them for the reader to access and verify if so desired, and repeatedly cautioned readers as to the report's limitations and urged readers to draw their own conclusions from the cited facts.  *See* Section I.B.  This is precisely the type of reporting that courts have found *not* to be grossly irresponsible.  *E.g., Farber v. Jefferys*, 959 N.Y.S.2d 486, 487 (N.Y. App. Div. 2013) (no gross irresponsibility where journalist "explained that his statement . . . was based on his expertise and research" and on other external sources, and "provided documentation to support why he believed what he wrote about the plaintiff was true"); *Post v. Regan*, 677 F. Supp. 203, 209 (S.D.N.Y. 1988) (no gross irresponsibility where defendants' "investigation and subsequent reporting were conducted in a careful, responsible manner.  The investigation was conducted over a two-month period, and was not done hastily.  It involved interviews of relevant parties and reviews of transactions and documents"), *aff'd*, 854 F.2d 1315 (2d Cir. 1988); *Weiner v. Doubleday & Co.*, 535 N.Y.S.2d 597, 602 (N.Y. App. Div. 1988) (no triable issue as to whether defendants acted in a grossly irresponsible manner where author "sprinkled . . . [c]autionary passages" throughout the publication.), *aff'd*, 549 N.E.2d 453 (N.Y. 1989).

*v. Travers Fine Jewels Inc.*, 2017 WL 1184305, at *2 (S.D.N.Y. Mar. 29, 2017) (opinions are absolutely protected). The Challenged Statements at issue here boil down to Arkham's conclusion that wallet addresses—which appear to have been used by Dfinity insiders—engaged in massive trading in the days following the ICP issue and that this activity appears to explain the precipitous fall in price. These statements are not defamatory because they constitute nonactionable opinions, and reasonable inference from facts that Dfinity does not appear to challenge.[21]

Whether something is a "fact [or] opinion is a question of law for the courts, to be decided based on what the average person hearing or reading the communication would take it to mean and is appropriately raised at the motion to dismiss stage." *Hayashi v. Ozawa*, 2019 WL 1409389, at *2 (S.D.N.Y. Mar. 28, 2019) (citation and internal quotation marks omitted). Furthermore, when evaluating the Challenged Statements, courts apply a "holistic approach" that involves "looking to the tone of the communication, its apparent purpose, and the setting in which it was made," *id.* at *3, including whether a "reasonable reader would have believed that the challenged statements were conveying facts" about Plaintiff, *Aviation Fin. Co. v. Chaput*, 2015 WL 13203653, at *17 (S.D.N.Y. Mar. 12, 2015) (citation omitted); *see also Brian v. Richardson*, 660 N.E.2d 1126, 1129 (N.Y. 1995). Applying these well-established legal principles, the Challenged Statements in the Arkham Report and the Arkham Video constitute nonactionable opinion for at least the following reasons.[22]

---

[21] For the Court's convenience, the Arkham Defendants have provided a chart that lists each of the Challenged Statements and identifies one or more bases (as described herein) why each statement is not defamatory as a matter of law. *See* Spillane Decl. at Exhibit 4.

[22] For the reasons discussed Section II, *infra*, the statements in the *Times* Article should not be attributed to the Arkham Defendants. But, in any event, the reasoning for why the statements in the Arkham Report and Arkham Video are nonactionable opinion apply in full force to the statements in the *Times* Article as well. *E.g.*, Compl. ¶ 35(a)-(c).

1.    Plaintiff Does Not Challenge the Factual Bases for the Challenged
Statements, Which Are Publicly Available and Not Refutable.

As an initial matter, Plaintiff cannot argue that any of the Challenged Statements are defamatory because the Arkham Defendants disclosed the publicly-available sources that formed the basis for their analysis, and such facts are not reasonable in dispute.  New York courts have held that statements of mixed opinion and fact may be defamatory only if (1) they "impl[y] that [they are] based upon facts which justify the opinion but are unknown to those reading or hearing it," *Sorvillo v. St. Francis Preparatory Sch.*, 607 F. App'x 22, 24 (2d Cir. 2015) (citation omitted), or (2) if Plaintiff challenges the veracity of not only the opinions, but also the underlying facts, *e.g.*, *Chau v. Lewis*, 935 F. Supp. 2d 644, 659 (S.D.N.Y. 2013), *aff'd*, 771 F.3d 118 (2d Cir. 2014). Neither condition is satisfied here.

None of the Challenged Statements imply that they are based on undisclosed facts.  To the contrary, the Arkham Defendants disclosed the publicly-available basis for their analysis and opinions.  *E.g.*, Arkham Report, at 2-4, 6-12 (describing the data analyzed from the publicly-available transactions on the ICP blockchain as of June 26, 2021, and the "off-chain" data examined from publicly-available sources, including online materials, including videos, articles, and social media posts).

Moreover, Dfinity does not appear to challenge the veracity of the underlying facts cited in the Arkham Report.  For example, for the statement: "[a]ddresses we suspect belong to the Dfinity treasury and project insiders have deposited 18.9 million ICP, worth ~$3.6 billion at time of deposit, to exchanges," Dfinity does not (and cannot) challenge the *amount* of ICP allegedly deposited; it instead challenges the *inference* to be drawn from the deposits—*i.e.*, whether they constituted an unusual "selling" as opposed to an unremarkable "transfer" of tokens.  *See* Compl. ¶ 40(b).  The Arkham Report and Arkham Video set forth the publicly-available factual predicates

for the opinions expressed in the Challenged Statements, and Dfinity cannot refute those underlying facts.  Consequently, the Challenged Statements constitute nonactionable opinion.  *See, e.g.*, *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 468 (S.D.N.Y. 2012) ("Courts have consistently held that when an author fully sets forth the factual basis for a particular view (and that factual basis is not challenged as false), then the author's conclusion constitutes nonactionable opinion."); *Eros Int'l, PLC v. Mangrove Partners*, 140 N.Y.S.3d 518, 519 (N.Y. App. Div. 2021) ("[S]tatements . . . accompanied by a recitation of facts on which they were based [are] nonactionable opinion.").

        2.      <u>The Challenged Statements Must Be Considered in the Context of the Arkham Defendants' Equivocal and Cautionary Language.</u>

Unable to plead that the Challenged Statements are based on undisclosed facts or to otherwise challenge the veracity of the underlying facts cited in the Arkham Report, Plaintiff attempts a piecemeal challenge to the conclusions that the Arkham Defendants drew based on those facts.  But each Challenged Statement must be evaluated in the context of the Arkham Report as a whole, which presents the analysis and conclusions of the Arkham Defendants based upon the cited publicly-available data.  Upon such a holistic evaluation, it is clear that all of the Challenged Statements are nonactionable opinion.

*First,* throughout the Arkham Report, the Arkham Defendants introduced disclaimers and limiting language that conveyed to readers areas of possible uncertainty and limits to their analysis.  For example, Arkham states that "*[w]e do not have clear and direct evidence* that these deposited tokens were sold," and that "[w]e must note that *we cannot definitively say* that ICP insiders carried out a pump-and-dump or a rug pull.  *We do not have direct confirmation* that the addresses in question belong to ICP insiders or the project itself, or that the ICP tokens deposited to exchanges were sold."  Arkham Report, at 5, 13 (emphases added).  The Arkham Report lays out the basis

for and conveys the uncertainty of its conclusions, positing that "*[i]f* all or most of the ICP deposited by these addresses *was in fact sold*, this . . . would go a long way towards explaining [the ICP's] exceptional decrease since listing." *Id.* at 5 (emphases added). Courts regularly find the use of similar disclaimers suggestive of the allegedly defamatory statements' being nonactionable opinion. *E.g.*, *Cummins v. SunTrust Cap. Mkts., Inc.,* 416 F. App'x 101, at 103-04 (2d Cir. 2011) (characterizations of option grants as "self-interested, abusive, unethical, unjustifiable, a manipulation of securities regulations, and akin to backdating" were nonactionable because "defendants included several disclaimers that *they could not say whether the options were actually backdated or otherwise illegal*" (emphasis added)); *Weiner*, 535 N.Y.S.2d at 602 (observing that "[c]autionary passages . . . sprinkled throughout the book" indicate that the challenged statements "were presented simply as nothing more than opinion, since when the reasonable reader encounters cautionary language, he or she tends to discount that which follows" (alterations, citation, and internal quotation marks omitted)); *Eros*, 140 N.Y.S.3d at 520 ("a reasonable reader would construe the statements not as fact but as opinion" where articles "contained a disclaimer as to the accuracy of any information reported therein"). Read as a whole, the Arkham Report draws heavily caveated inferences based on observed circumstances in the blockchain and statements by Dfinity itself. Plaintiff's challenge to those inferences fail because no reasonable reader could conclude that Arkham was asserting them as fact; instead, Arkham was offering them as a possible interpretation, assuming the accuracy of the underlying cited data.

The Arkham Video contained similar disclaimers that render the Challenged Statements nonactionable opinion. The Arkham Defendants cautioned viewers that "this is a private investigation based on our proprietary analysis and this video is not financial or legal advice," and urged its viewers not to blindly accept its observations and conclusions, and instead to "do their

own research and reach their own conclusions with the information we provide." Arkham Video; *see also Zuber v. Bordier*, 522 N.Y.S.2d 610, 611 (N.Y. App. Div. 1987) (statement about plaintiff's teaching ability was an nonactionable opinion where "the facts supporting the defendant's opinion were set forth, so as to ensure that the reader and the listeners had an opportunity to assess the basis upon which the opinion was reached and reach their own conclusions"); *Brian*, 660 N.E.2d at 113 (finding statement to be nonactionable opinion where defendant offered his view, and "set out the basis for that personal opinion," but ultimately "le[ft] it to the readers to evaluate it for themselves"). The Challenged Statements in the Arkham Video should therefore similarly be considered nonactionable opinions on this basis.

*Second*, the Challenged Statements are also expressly qualified by cautionary language such as "[w]e believe," "[i]t appears that," and "[w]e suspect that." *See* Compl. ¶ 38(a) ("*It appears that* this was not a coincidence or accident . . . ." (emphasis added)); *id.* ¶ 40(a) ("Our analysis *has led us to believe* that possible insiders connected to Dfinity have been dumping billions of dollars of ICP on exchanges at the expense of small early supporters and retail investors." (emphasis added)).[23] Courts routinely rely on similar qualifying language to conclude that a challenged statement is a nonactionable opinion. *E.g.*, *Valley Elecs. AG*, 2022 WL 893674, at *2 (statement that "'it does not appear' that Valley is interested in providing its consumers accurate information" constitutes nonactionable opinion (alteration omitted)); *Cummins v. Suntrust Cap. Mkts., Inc.*, 649 F. Supp. 2d 224, 253 (S.D.N.Y. 2009) (statement in which "the authors prefaced the comparison with the qualifier, '*it appears to us*'" was nonactionable opinion), *aff'd*, 416 F. App'x 101 (2d Cir. 2011); *Eros*, 140 N.Y.S.3d at 521 (tweet beginning with "I still

---

[23] This also applies to allegedly defamatory Statement 4 in the *Times* Article. *See* Compl. ¶ 35(d).

believe" was nonactionable opinion).[24]   The Challenged Statements made clear, on their face, that their conclusions were inferential and readers could decide for themselves whether the cited facts supported the inferences.

*Third*,  the vast majority of the Challenged Statements "carry no precise meaning as used," which similarly makes the Challenged Statements nonactionable.  *See Valley Elecs.*, 2022 WL 893674, at *2.  For example, Arkham indicated that "Dfinity *has not been transparent* about token allocation and unlocking," Compl. ¶ 40(d), and Arkham observed that there were "large deposits to exchanges from the Treasury and *suspected* insiders, *lack of transparency* on token distribution, a *byzantine process* for outside supporters to claim tokens," *id*. ¶ 40(i) (emphases added). Combined with the qualifying language noted above, Arkham plainly conveyed broad and general concepts, not specific allegations of wrongdoing.  Courts regularly find use of similar statements with imprecise language to be nonactionable opinion, since a reasonable reader could not construe such statements as facts.  *Valley Elecs*, 2022 WL 893674, at *1 nn.1-2 (finding that imprecise statements that a company marketed a product "without solid evidence," "put[] people in harm[']s way," and is "particularly unethical" constituted nonactionable opinion).

*Finally*, the same reasoning applies to the Challenged Statements in the Arkham Report that plainly constitute hyperbole, such as "*one of the most extreme cases of investor mistreatment in the history of crypto markets*," "*exceptional decrease* in the price of ICP," and "*one of the biggest financial controversies ever.*"  *See* Compl. ¶¶ 38(c), 40(f), 40(i) (emphases added).  Such hyperbolic statements are nonactionable opinion since they are "indefinite, ambiguous, and

---

[24]  *See also NOVAGOLD Res., Inc. v. J Capital Rsch. USA LLC*, 2022 WL 900604, at *5 (E.D.N.Y. Mar. 28, 2022) (documents that include phrases such as "we believe"  and "it seems to us" are "pregnant with signals to the reader that the statements made therein were opinion"); *Carto v. Buckley*, 649 F. Supp. 502, 511 (S.D.N.Y. 1986) ("The phrase 'presumably,' similar to the phrases 'I suspect' and 'it is probable,' expresses Buckley's constitutionally protected belief or opinion.").

incapable of being objectively characterized as true or false." *Valley Elecs*, 2022 WL 893674, at *2 (citation omitted); *see also Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014) ("[T]he epithets . . . 'sucker,' 'fool,' 'frontman,' 'industrial waste,' 'pilot' of the 'ship of doom,' and 'crooks or morons'—are hyperbole and therefore not actionable opinion.  While someone may not appreciate being called a fool, it is an expression of one's view of another . . . ."); *Fedak v. YIMBY, Inc.*, 2018 WL 6697963, at *6 (S.D.N.Y. Dec. 20, 2018) ("statement that 'Dan George is a fraud' is an opinion"); *Gentile v. Grand St. Med. Assocs.*, 911 N.Y.S.2d 743, 745 (N.Y. App. Div. 2010) ("Even apparent statements of fact may assume the character of statements of opinion, and thus be privileged, when made in circumstances in which an audience may anticipate the use of epithets, fiery rhetoric or hyperbole." (alterations, citation, and internal quotation marks omitted)).  Whether the ICP collapse is one of the biggest controversies ever is in the eye of the beholder, and even if the statement is embarrassing to Dfinity, an "insult is not itself a fact—but rather, is one's perception of facts—at the time it is uttered." *Chau*, 771 F.3d at 129.  The Challenged Statements in the Arkham Report and Arkham Video are similarly nonactionable on this basis, particularly given that there is no controversy that Dfinity's token collapsed spectacularly, causing enormous investor injury in its wake.

### C.    The Challenged Statements Are Incapable of Defamatory Meaning.

Additionally, many of the Challenged Statements are not defamatory as a matter of law because they have no defamatory meaning.  To be actionable as defamation, a statement "must do more than cause discomfort or affront; the statement is measured not by the sensitivities of the maligned, but the critique of reasonable minds that would think the speech attributes odious or despicable characterizations to its subject." *Chau*, 771 F.3d at 127.[25]  Hence, whether a statement

---

[25] *See also Margolies v. Rudolph*, 2022 WL 2062460, at *4 (E.D.N.Y. June 6, 2022) ("A defamatory statement is one that exposes an individual to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion,

is capable of defamatory meaning is a question of law to be resolved by the Court, when considering "the publication as a whole" and "against the background of its issuance with respect to the circumstances of its publication." *Weinstein v. Friedman*, 1996 WL 137313, at \*10-11 (S.D.N.Y. Mar. 26, 1996) (citation and internal quotation marks omitted), *aff'd*, 112 F.3d 507 (2d Cir. 1996).

Applying these principles, the Arkham Report read as a whole is not capable of having a defamatory meaning, as Plaintiff has not pled facts to suggest that the Challenged Statements would expose Dfinity to "public hatred," "shame," "ridicule," or any similar feeling. *Lindell v. Mail Media Inc.*, 575 F. Supp. 3d 479, 486 (S.D.N.Y. 2021) (citation omitted). Indeed, they would do no such thing, because the Challenged Statements plainly reflect Arkham's hypothesis regarding the causes of a severe drop in the value of the ICP token, which spoke to the amount and timing of token sales. *See, e.g.*, Compl. ¶ 40(b) ("Addresses we suspect belong to the Dfinity treasury and project insiders have deposited 18.9 million ICP . . . to exchanges."); *id.* ¶ 40(d) ("Dfinity has not been transparent about token allocation and unlocking, unlike other major projects."); *id.* ¶ 40(f) ("[T]he exceptional decrease in the price of ICP since listing is indicative of massive selling, which would likely be coming from these deposits . . . .").[26]  The Challenged Statements do not suggest any illegal or immoral conduct; they imply only that insiders sold ICP tokens, driving prices down, which harmed retail investors who faced difficulties in accessing their tokens. The most that these allegations say about Dfinity is that it failed to place restrictions on certain insiders from engaging in sales of ICP tokens, and that its interface for retail investors was

---

ostracism, degradation, or disgrace, or induces an evil opinion of one in the minds of right-thinking persons, and deprives one of confidence and friendly intercourse in society." (quoting *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 113 (2d Cir. 2005)) (alterations omitted)).

[26] Again, the statements in the *Times* Article should not be attributed to the Arkham Defendants. *See* Section II, *infra*. But, in any event, the reason the statements in the Arkham Report and Video are incapable of having a defamatory meaning also apply equally to the statements in the *Times* Article. *See* Compl. ¶ 35(a)-(e).

cumbersome and hindered their ability to access and sell their own tokens to reduce their losses. Suggesting that Dfinity could have taken certain steps to prevent the collapse of its crypto offering is not defamation.

Courts have found similar statements criticizing business performance not to be defamation, but instead a legitimate means to ensure that performance is better in the future. *E.g.*, *Mestecky v. N.Y.C. Dep't of Educ.*, 791 F. App'x 236, 239 (2d Cir. 2019) (statement that teacher "had a higher number of absences than was recorded on one of her previous reviews . . . does not rise to the level of defamation, since it hardly exposes [the teacher] to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace of the sort required to be defamatory" (citation and internal quotation marks omitted)); *Chau*, 771 F.3d at 128 (statements that speaker wished to "bet against" whatever financial products were created by manager of investment firm not capable of defamatory meaning); *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 271 (2d Cir. 1999) (statement that employee's work performance was "unsatisfactory" not capable of defamatory meaning). The Challenged Statements in the Arkham Report and Arkham Video likewise are nonactionable for this additional reason.

### D.    The Complaint Fails to Plead Special Damages for the Defamation Claim.

In order to sustain its defamation claim, Plaintiff is required to plead special damages, as the Challenged Statements do not constitute defamation *per se*. *Collins*, 2017 WL 1184305, at *3. Plaintiff's abject failure to plead such special damages constitutes an independent basis for dismissing of the defamation claim in full. In particular, the record is clear that the decline in the value of ICP occurred *before* the Challenged Statements were ever published. Indeed, that significant market event served as the impetus for the Arkham Defendants' protected speech. Further, the publicly-listed price of the ICP token actually *increased* after the Arkham Report was published, directly rebutting Plaintiff's allegation that the Challenged Statements somehow injured

Dfinity by adversely affecting the value of the ICP token.

              1.     The Challenged Statements Are Not Defamatory *Per Se*.

Plaintiff cannot establish that the Challenged Statements constitute defamation *per se,* that is, that the statements were "so egregious that it is presumed to cause serious harm." *Moritz v. Town of Warick*, 2017 WL 4785462, at *5 n.3 (S.D.N.Y. Oct. 19, 2017) (citation omitted). Consistent with this high standard of outrageousness, a statement is only defamatory *per se* under New York law if it (1) charges the plaintiff with a serious crime; (2) tends to injure the plaintiff in her or his trade, business or profession; (3) imputes to the plaintiff a loathsome disease; or (4) imputes unchastity to a woman. *Liberman v. Gelstein*, 605 N.E.2d 344, 347 (N.Y. 1992).

While Plaintiff does not allege in the Complaint that any of the Challenged Statements rise to the level of being defamatory *per se*, Plaintiff may argue that certain statements "tend to injure [the Dfinity Foundation] in [its] trade, business or profession." *See id.* The only Challenged Statements made by the Arkham Defendants that arguably reflect on Dfinity's "trade, business, or profession" include Arkham Defendants' suggestion that Dfinity "has not followed industry practices" with regard to its treatment of project insiders (Compl. ¶ 40(c)) and that it has "not been transparent" as compared to other projects and industry best practices (*id.* ¶¶ 40(d), (g), (h), (i)).[27]

These Challenged Statements do not rise to the level of "imput[ing] incompetence, incapacity or unfitness in the performance of [Dfinity's] profession," *Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 336 (S.D.N.Y. 2010) (citation omitted), but are instead a challenge to the reasonableness of Dfinity's business practices as to its first and only crypto offering, as compared to other market participants. *See Liberman,* 605 N.E.2d at 48 (this exception is appropriately

---

[27] The Challenged Statements that relate to the transfer of ICP from the Treasury and "suspected insiders" to exchanges are not defamatory *per se* because these statements do not "tend to injure" Dfinity "in its trade, business or profession." *See* Compl. ¶¶ 40(b), (e), (i).

"limited to defamation of a kind that is incompatible with the proper conduct of the business, trade, [or] profession" (citation omitted)).  These Challenged Statements also fail to establish defamation *per se* because they are not "of significance and importance for the operation of the business, rather than a more general reflection upon the plaintiff's character or qualities."  *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011) (alterations and citation omitted); *Van-Go Transp. Co. Inc. v. N.Y.C. Bd. of Educ.*, 971 F. Supp. 90, 98 (E.D.N.Y. 1997) ("Reputational injury to a person's business, or to a company, consists of a statement that either imputes some form of fraud or misconduct or a general unfitness, incapacity, or inability to perform one's duties.").  None of the Challenged Statements about Dfinity's business rise to this exacting standard.

The remainder of the Challenged Statements in the Arkham Report and Arkham Video do not comment on Dfinity's business practices, but instead relate to trades made by unidentified individuals associated with Dfinity—and so cannot reasonably be read to denigrate Dfinity's business.  *See* Compl. ¶¶ 38(a), (c), 40(f).[28]  And of the handful of other statements that reference "insiders," "project insiders," and "insiders connected to Dfinity," no reasonable reader would read these statements as denigrating *Dfinity's* business.  *See* Compl. ¶¶ 38(a)-(b), 40(a), (h).[29]  In fact, Arkham expressly disclaimed that these observations and conclusions were directed at any specific individual or entity.[30]

---

[28] This also applies to certain of the allegedly defamatory statements in the *Times* Article, which should not be attributed to the Arkham Defendants.  *See* Compl. ¶ 35(a)-(c).

[29] This also applies to allegedly defamatory Statement 5 in the *Times* Article.  *See* Compl. ¶ 35(e).

[30] *See* Arkham Report, at 2 ("Our analysis identified addresses likely belonging to the following entities:  Dfinity; Exchanges, namely Coinbase, Binance, Huobi, and OKEx; Suspected insiders coordinated with Dfinity."); *id.* at 2-4 ("In contrast to the Treasury . . . the key address we believe belongs to Dfinity . . . suspected insiders have deposited tokens continually in the weeks since listing . . . .  There is no unifying system, leading us to believe that there is no single underlying entity.").

2.    <u>Plaintiff Fails to Plead Special Damages Arising from the Challenged Statements.</u>

Because the *per se* "exception" is unavailable here, Plaintiff must plead special damages to survive a motion to dismiss, that is, "the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation." *Collins*, 2017 WL 1184305, at *3 (citation omitted).  Such damages must be "fully and accurately stated, with sufficient particularity to identify actual losses." *Id.* (citation omitted).  This "particularity requirement is strictly applied, as courts will dismiss defamation claims for failure to allege special damages with the requisite degree of specificity." *Thai*, 726 F. Supp. 2d at 330.

Plaintiff entirely fails to allege *any* special damages.  As an initial matter, the Complaint does not allege the loss of anything of economic or pecuniary value.  Plaintiff instead conclusorily alleges that "Defendants' conduct caused a major price collapse of the ICP token, causing Dfinity an enormous amount of direct monetary damage." Compl. ¶ 48.  Conspicuously absent from the Complaint, however, are any allegations regarding how much the price of the ICP token collapsed and the amount of losses suffered by Dfinity—or even, indeed, that Dfinity itself owned any ICP tokens that declined in value.  This is fatal to Plaintiff's claim. *See Global Auto, Inc. v. Hitrinov*, 2021 WL 7367078, at *10 (E.D.N.Y. Aug. 20, 2021) (no special damages where party "d[id] not identify any actual losses with particularity or name customers that ceased to do business with [it] as a result of the . . . defamatory comments"); *Marom v. Pierot*, 2020 WL 6572509, at *8 n.6 (S.D.N.Y. Aug. 30, 2020) (no special damages where plaintiff does not "set forth an itemized account of her losses" (citation omitted)).

Plaintiff cannot plead such allegations with the requisite specificity because the Arkham Defendants did not, in fact, cause Dfinity to suffer losses in the value of the ICP token.  To the

contrary, the Arkham Report was a post-mortem analysis published *in direct response to* a severe price drop in the value of ICP *that had already happened* and was already a matter of extensive public discourse and speculation.  The same holds true for the Arkham Video.  In fact, as judicially noticeable sources conclusively confirm, the value of the ICP token actually *increased* after the Arkham Report and ArkhamVideo were published:  its value was $54.07 on June 28, 2021,  the day of the Arkham Report but rose to $72.12 by August 28, 2021,  two months later.[31]  In other words, the ICP token lost 95% of its value *prior to* any of the Challenged Statements, and gained significant value back in the weeks that followed the publication of the Arkham Report and Arkham Video.  This  directly contradicts Plaintiff's claim that "[d]ue to Defendants' defamatory statements . . . the token eventually lost a substantial percentage of its value."  Compl. ¶ 48.  And even if the value of the ICP token had fallen in value (it did not), Plaintiff does not allege how many ICP tokens (if any) it owns, thereby suffering economic or pecuniary loss.

Nor has Plaintiff attempted to show—as it must—how any alleged damages "flowed directly from the injury to reputation caused by the defamation."  *Marom*, 2020 WL 6572509, at *8 n.6 (alterations and citation omitted).  Plaintiff claims that "Defendants' conduct . . . ma[de] it more difficult for Dfinity to develop its business and related products and services . . . creat[ed] [more] obstacles for Dfinity in attracting and retaining talent, generat[ed] an ongoing rumor mill about Dfinity specifically focused on the false and defamatory statements that are the subject of this lawsuit, and le[d] to decreased industry coverage of the Internet Computer's revolutionary technological advancements."  Compl. ¶ 49.  This is a prototypical conclusion—Plaintiff offers no allegations of fact that would support this claimed upshot.  Not surprisingly, courts have routinely

---

[31] *See, e.g., Internet Computer*, CoinMarketCap, https://coinmarketcap.com/currencies/internet-computer/ (last visited Sept. 15, 2022).  Presumably, Arkham's thorough analysis gave the market comfort that it understood the prior price collapse, which encouraged resumed trading.

found virtually identical allegations insufficient to show special damages. *See e.g.*, *Brantley v. Mun. Credit Union*, 2021 WL 981334, at *9 (S.D.N.Y. Mar. 16, 2021); *see also Marom*, 2020 WL 6572509, at *8 n.6 ("Vague injuries such as dignitary harm or mere injury to reputation do not constitute special damages." (citation omitted)); *Fleming v. Laakso*, 2019 WL 959521, at *7 (S.D.N.Y. Feb. 5, 2019) ("Injury to reputation and great pain and mental anguish are not special damages." (citation and internal quotation marks omitted)).[32]  Plaintiff's failure to plead special damages is fatal to its claim.

## II.   THE ARKHAM DEFENDANTS ARE NOT LIABLE FOR THE STATEMENTS PUBLISHED IN THE *TIMES* ARTICLE.

The Arkham Defendants are not liable for the Challenged Statements cited in the Complaint that are attributed to the *Times* Article since Plaintiff does not allege any involvement by the Arkham Defendants in the Article's publication, nor that the Arkham Defendants knew the contents of the Article in advance, or even foresaw its publication.

Even if the *Times* Article had merely repeated the Challenged Statements of the Arkham Defendants, this would not be enough to state a claim for defamation as to the Arkham Defendants. Under New York law, "a plaintiff may not recover damages from the original author for either product disparagement or slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002); *see also Kesner v. Dow Jones & Co.*, 515 F. Supp. 3d 149, 178 n.7 (S.D.N.Y. 2021) (same);

---

[32] Generic allegations of business harm are similarly insufficient to plead special damages. *See Zahrey v. City of N.Y.*, 2009 WL 1024261, at *15 n.23 (S.D.N.Y. Apr. 15, 2009) ("specific, verifiable loss of business (*e.g.*, hike in malpractice rates, loss of certain clients) constitutes special injury, but allegations of general loss of business do not"); *Wilson v. Tarricone*, 2013 WL 12084504, at *3 (S.D.N.Y. Sept. 26, 2013) (no special damages where plaintiff alleged, among other things, "the refusal of certain Members of the AAJ to consider hiring Plaintiff" (alterations and citation omitted)), *aff'd*, 563 F. App'x 864 (2d Cir. 2014).

*Pasqualini v. MortgageIT, Inc.*, 498 F. Supp. 2d 659, 670-71 (S.D.N.Y. 2007) (same).

No factual allegation is (or could be) made here to suggest that the Arkham Defendants were responsible for or ratified the *Times* Article. Instead, Plaintiff alleges that: (1) "the Arkham Report was shared with the *Times* prior to the publication of the Article," (2) "on information and belief that, the *Times* Defendants and Arkham Defendants closely coordinated the publication of the Article on the same date that the Arkham Report and Arkham Video would be released," and (3) some unidentified "wealthy individual" commissioned the creation of the Arkham Report "with the intent and purpose that the report and statements would be shared with Sorkin and Livni at the *Times* and republished in an article." Compl. ¶¶ 11, 13. Even assuming that these allegations were true, they are insufficient to hold the Arkham Defendants liable for the New York Times' republication of the analysis in the Arkham Report, or for the conclusions independently drawn by the New York Times writers. *See e.g.*, *Egiazaryan v. Zalmayev*, 2011 WL 6097136, at *6 (S.D.N.Y. Dec. 7, 2011) (no defamation where plaintiff "does not offer any such facts . . . tending to show that [defendant] approved of, participated in, or intended the republication"); *Croy v. A.O. Fox Mem'l Hosp.*, 68 F. Supp. 2d 136, 144 (N.D.N.Y. 1999) (no defamation where complaint was "entirely devoid of any allegations of [defendant's] involvement in the republication of the information contained in his memorandum").

Instead of alleging that the Arkham Defendants were responsible for the publication of the *Times* Article, Plaintiff seems to allege that the republication was foreseeable to the Arkham Defendants by virtue of their alleged cooperation with the New York Times. Compl. ¶¶ 6, 11. But foreseeability—even if it had existed here—does not impose liability, absent a high degree of control and/or involvement, none of which is alleged here. *See Cerasani v. Sony Corp.*, 991 F. Supp. 343, 351 (S.D.N.Y. 1998) (observing that "author of purportedly non-fiction paperback

book not liable for republication, over which he had no control, of same material in reissued paperback form, regardless of 'foreseeability'" (citation omitted)); *see also Pisani v. Staten Island Univ. Hosp.*, 2008 WL 1771922, at *9 (E.D.N.Y. Apr. 15, 2008) (disagreeing with the position that "defendants are responsible for any reasonably foreseeable republication of their allegedly defamatory statement").  In any event, Plaintiff nowhere pleads that the Arkham Defendants foresaw the publication of the *Times* Article.

## III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR A VIOLATION OF GENERAL BUSINESS LAW § 349.

Finally, Plaintiff's inapt effort to invoke General Business Law ("GBL") § 349 fails because Plaintiff fails to allege an injury to consumers as the statute requires.

General Business Law § 349 makes unlawful any "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state[.]" N.Y. Gen. Bus. Law § 349.  To state a claim, a plaintiff must show that the "defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *Lokai Holdings LLC v. Twin Tiger USA LLC*, 306 F. Supp. 3d 629, 642 (S.D.N.Y. 2018) (citation omitted).  Because GBL § 349 is, "at its core, a consumer protection device," Plaintiff must allege "some harm to the public at large is at issue" and "the gravamen of the[ir] complaint must be consumer injury or harm to the public interest."  *LBF Travel, Inc. v. Fareportal, Inc.*, 2014 WL 5671853, at *10 (S.D.N.Y. Nov. 5, 2014) (citation omitted).

The Arkham Report was not consumer-oriented and did not seek to affect consumer purchasing patterns.  Moreover, where, as here, the core of Plaintiff's claim is "harm to another business as opposed to consumers, the public harm . . . is too insubstantial to satisfy the pleadings requirements" of a Section 349 claim.  *Lokai*, 306 F. Supp. at 642 (citation and internal quotation

marks omitted); *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 273 (S.D.N.Y.

2003) ("Commercial claimants under § 349 must allege conduct that has *significant ramifications*

for the public at large in order to properly state a claim." (citation and internal quotation marks

omitted)).  The Complaint is replete with conclusory allegations of harm to Dfinity's business,

rather than any direct consumer harm.[33]  Indeed, as noted above, no consumer harm could be

alleged, as the collapse of the price of the ICP token entirely *preceded* all of the conduct of the

Arkham Defendants referenced in the Complaint.  *See* Section I.D.2, *supra*.  Moreover, it is clear

from the Complaint that the damage alleged is not any consumer injury or harm to the public

interest, but rather alleged albeit unspecified harm to Dfinity itself.

Courts routinely dismiss claims based on virtually identical allegations.  *See Romeo &*

*Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 2014 WL 4723299, at *5-6 (S.D.N.Y. Sept. 23,

2014) (dismissing GBL § 349 claim based on alleged "lost sales and diminution of goodwill and

business reputation" because "plaintiff provide[d] no facts showing how defendants' conduct

injured the public interest, as opposed to simply injuring its own business reputation"); *Gucci*, 277

F. Supp. 2d at 274 (dismissing GBL § 349 counterclaim where "the gravamen of [the] counterclaim

is harm to DFA's business in the form of:  (1) lost profits from items that are returned to DFA by

customers . . . and (2) a general loss of good will from consumers who may hear through word-of-

mouth that DFA's goods are not authentic").  The same logic warrants dismissal of the GBL § 349

---

[33] *See, e.g.*, Compl. ¶ 2 (alleging that Defendants caused "Dfinity [to] suffer[] extraordinary damages"); *id.* ¶ 3(e) (alleging that "the Arkham Report was created . . . to cause reputational and financial damage to Dfinity and the Internet Computer Protocol."); *id.* at ¶ 14 (alleging that "Defendants carried out their malicious actions [to] intentionally harm Dfinity and its reputation, interfere with its business dealings and relationships . . . and potentially bankrupt Dfinity in the process."); *id.* ¶ 15 (alleging that "the Arkham Report . . . would naturally cause tremendous reputational and economic harm to Dfinity."); *id.* ¶ 17 (alleging that "Sorkin and/or Livni . . . along with Arkham and it financier(s) . . . cause[d] substantial damage to Dfinity[]"); *id.* ¶ 18 (alleging that "Defendants' false and defamatory statements and tortious conduct have caused, and will continue to cause, extraordinary damages to Dfinity and the Internet Computer Protocol."); *id.* ¶ 48 (alleging causation to "Dfinity [of] an enormous amount of direct monetary damage, and reputational and business harm"); *id.* ¶ 49 (alleging harm to "the reputation of Dfinity" and "substantial harm to Dfinity as an ongoing business").

claim under the instant facts.

Plaintiff's suggestion of "consumer harm" based upon allegations of reputational harm to "its researchers and developers" and "its investors" similarly fails. *See, e.g.*, Compl. ¶¶ 12, 59. *First*, those allegations fall short because they are not the "gravamen" of the Complaint. *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 1992 WL 170559, at *4 (S.D.N.Y. July 2, 1992) (dismissing GBL § 349 claim where "the alleged harm to plaintiff's business far outweighs any incidental harm to the public at large"); *Vitolo v. Mentor H/S, Inc.*, 426 F. Supp. 2d 28, 34 (E.D.N.Y. 2006) (dismissing GBL § 349 where "[t]he Complaint focuses almost entirely on the losses suffered by Plaintiff and his business, rather than to consumers or [p]laintiff's patients"), *aff'd*, 213 F. App'x 16 (2d Cir. 2007); *Pfizer, Inc. v. Stryker Corp.*, 2003 WL 21660339, at *4 (S.D.N.Y. July 15, 2003) (dismissing GBL § 349 claim even though "consumers *eventually* stood to be affected by any defects in the product at issue" (emphasis added)).

*Second*, such allegations fail because the Arkham Report and Video say *nothing* about Dfinity's "researchers and developers" and *nothing* that could expose Dfinity's "investors" to reputational harm. Instead, the Arkham Report suggests that investors in Dfinity were left in the dark and suffered losses as a result of actions taken by "possible insiders connected to Dfinity." Arkham Report, at 1. The Complaint identifies no effect on investors other than the movement in price of the ICP token, the collapse of which occurred entirely prior to the Arkham Report. *Id.*

*Finally*, any alleged harm to Dfinity's business partners or investors (none of which is factually detailed here) would not be sufficient to establish consumer harm under GBL § 349. *See INV Accelerator, LLC v. MX Techs., Inc.*, 2020 WL 882902, at *6-7 (S.D.N.Y. Feb. 24, 2020) (dismissing GBL § 349 claim based on allegations of harm to startups and entrepreneurs because "harms to startups and entrepreneurs do not qualify as consumer-oriented because they were not

34

incurred while purchas[ing] goods and services for personal, family, or household use" (citation and internal quotation marks omitted)).[34] Plaintiff fails to plead any actionable injury to support a claim under GBL § 349.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated:  September 16, 2022                 Respectfully submitted,


                                                        ARKHAM INTELLIGENCE, INC., MIGUEL
                                                        MOREL, AND ZACHARY LERANGIS


                                                        By their attorneys,

                                                        /s/ Meghan K. Spillane

                                                        Jeffrey A. Simes
                                                        Meghan K. Spillane
                                                        GOODWIN PROCTER LLP
                                                        620 Eighth Avenue
                                                        New York, NY 10018
                                                        Tel.:    (212) 813-8800
                                                        Fax:    (212) 355-3333
                                                        jsimes@goodwinlaw.com
                                                        mspillane@goodwinlaw.com

---

[34] *See also Jones Real Est., Inc. v. Avatel Techs., Inc.*, 2019 WL 1130154, at *7 (S.D.N.Y. Mar. 12, 2019) (dismissing GBL § 349 claim based on allegations of harm to investors because "to conclude that a transaction between two corporate entities is 'consumer-oriented' merely because the entities are owned by individuals would obliterate the distinction at the root of [section 349]" (citation and internal quotation marks omitted)); *USAlliance Fed. Credit Union v. CUMIS Ins. Soc'y, Inc.*, 346 F. Supp. 2d 468, 473 (S.D.N.Y. 2004) (dismissing GBL § 349 claim based on allegations of harm to members of credit union because to find "any transaction between an insurer and publicly traded company" to be "consumer oriented simply because the company was owned by dispersed shareholders" would "obliterate the distinction at the root of [Section 349]").

## CERTIFICATE OF SERVICE

      I, Meghan K. Spillane, hereby certify that a copy of the foregoing Memorandum of Law in Support of the Arkham Defendants' Motion to Dismiss the Complaint, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on September 16, 2022.

Dated:  September 16, 2022                                  */s/ Meghan K. Spillane*