UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— X
:
DFINITY FOUNDATION, :
 :
                  Plaintiff, :
 : 1:22-cv-5418-LAK
    - against - :
 :
THE NEW YORK TIMES COMPANY, *et al.*, :
 :
                  Defendants. :
———————————————————————— X

# REPLY MEMORANDUM OF LAW
# IN SUPPORT OF THE NEW YORK TIMES DEFENDANTS'
# MOTION TO DISMISS

Dana R. Green
David E. McCraw
The New York Times Company
Legal Department
620 Eighth Avenue
New York, NY 10018
Phone: (212) 556-5290
Fax: (212) 556-4634
dana.green@nytimes.com

*Attorneys for Defendants The New York Times, Andrew Ross Sorkin, and Ephrat Livni*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

I.   The Article is Not Actionable ..................................................................................................1

II.  The Three Remaining Statements At Issue Are Not Actionable .............................................2

     A.   Statement 1 is Not Actionable .......................................................................................3

     B.   Statement 4 is Not Actionable .......................................................................................4

     C.   Statement 5 is Not Actionable .......................................................................................6

III. Dfinity Fails to Plead Actual Malice as a Matter of Law .........................................................7

CONCLUSION ...................................................................................................................................11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aronson v. Wiersma*,
    65 N.Y.2d 592 (N.Y. 1985) ...................................................................................................3

*Biro v. Condé Nast*,
    963 F. Supp. 2d 255 (S.D.N.Y. 2013) ..................................................................................8, 9

*Brimelow v. New York Times Co.*,
    2020 U.S. Dist. LEXIS 237463 (S.D.N.Y. Dec. 17, 2020) .......................................................4

*Butowsky v. Folkenflik*,
    No. 18-cv-442, 2019 U.S. Dist. LEXIS 132268 (E.D. Tex. Aug. 7, 2019) ..............................8

*Celle v. Filipino Reporter Enterprises*,
    209 F.3d 173 (2d Cir. 2000) .....................................................................................................8

*Jaliman v. Selendy*,
    No. 12820/04, 2005 N.Y. Misc. LEXIS 3291 (N.Y. Sup. Ct. Westchester Cty.
    Mar. 7, 2005) ............................................................................................................................8

*McFarlane v. Sheridan Square Press, Inc.*,
    91 F.3d 1501 (D.C. Cir. 1996) .................................................................................................9

*Palin v. New York Times Co.*,
    940 F.3d 804 (2d Cir. 2019) ...................................................................................................10

*Project Veritas v. Leland Stanford Junior University*,
    2022 U.S. Dist. LEXIS 138962 (W.D. Wash. Aug. 4, 2022) .................................................10

*Project Veritas v. New York Times Co.*,
    No. 63921/2020, 2021 N.Y. Misc. LEXIS 2264 (N.Y. Sup. Ct. Westchester
    Cty. Mar. 18, 2022) ................................................................................................................10

*Project Veritas v. New York Times Company*,
    2021 N.Y. App. Div. LEXIS 5982 (1st Dept. 2021) ..............................................................10

*Robinson v. Fischer*,
    09 Civ. 8882 (LAK), 2010 U.S. Dist. LEXIS 137660 (S.D.N.Y. Dec. 29,
    2010) ........................................................................................................................................2

*Tiversa Holding Corp. v. LabMD, Inc.*,
    No. 13-1296, 2014 U.S. Dist. LEXIS 54632 (W.D. Pa. Apr. 21, 2014) ...................................9

*U.S. Dominion, Inc. v. Powell*,
 554 F. Supp. 3d 42 (D.D.C. 2021) ..................................................................................... 8, 9

*Zimmerman v. Al Jazeera America, LLC*,
 246 F. Supp. 3d 257 (D.D.C. 2017) ........................................................................................ 8

*Zuckerbrot v. Lande*,
 167 N.Y.S.3d 313 (N.Y. Sup. Ct. 2022) ................................................................................. 8

The Times defendants (collectively, "The Times") respectfully submit this reply memorandum of law in further support of their motion to dismiss plaintiff Dfinity's claims against them with prejudice. In an effort to make out a claim, Dfinity's opposition ("Opp."), Dkt. 78, repeatedly and wrongly attempts to conflate The Times with Arkham and the Arkham Report.[1] But The Times did not publish the Report, and the Complaint does not assert claims against The Times based on the Report. The sole speech at issue in relation to The Times is the Article. That article is not actionable. It is an article about competing points of view on a matter of public concern. It does not "endorse" Arkham's perspective—or Dfinity's, for that matter. When it quotes Arkham, it provides either non-actionable opinions or statements that Dfinity's pleadings show are substantially true. Equally unavailing is Dfinity's claim that The Times published the Article with actual malice—a claim soaked in conspiracy theory rather than credible allegations of fact. To allow Dfinity's claims to proceed would profoundly chill ordinary journalism in ways that clearly are contrary to the First Amendment. Dfinity's claims against The Times should be dismissed with prejudice.[2]

## I.      The Article is Not Actionable

As set out previously, the Article as a whole is non-actionable for multiple reasons. *See* Mem. in Supp. of The Times Defs.' Mot. to Dismiss ("NYT Mem.") at 7-14, Dkt. 52. Fundamentally, the Article is not actionable because it does not make false, factual allegations about Dfinity: it reports true facts—the ICP token rapidly gained and lost value—and then appropriately presents competing theories in the ongoing debate about the drivers of that crash.

---

[1] At times, Dfinity's opposition even purports to quote from the Article—but in fact quotes words from the Report. *See, e.g.*, Opp. at 26.
[2] In opposition, Dfinity argues that the procedural provisions of the New York State Anti-SLAPP do not apply in a diversity action. Opp. at 19. But The Times did not move to dismiss under those procedural provisions. Dfinity does not dispute that the substantive provisions of the New York Anti-SLAPP law do apply: *i.e.*, Dfinity must plead and prove actual malice as a matter of state law. *See id* at 19 & 32 n.32.

1

Readers would readily understand the Article to present competing theories, not proven conclusions. Whether evaluated as opinion, opinion based on disclosed facts, or lack of defamatory meaning, the outcome is the same: the claims must be dismissed.

In an effort to evade that outcome, much of Dfinity's opposition is devoted to claiming the Article "endorsed" the Arkham Report as "authoritative." *See, e.g.* Opp. at 2, 5, 10, 14, 22, 24, 28, 33, 35, 38. These arguments are baseless. The Article offers no such endorsement. Whereas the Article describes Dfinity in flattering terms as an "ambitious project" with the backing of "one of the most prestigious venture capital firms in Silicon Valley," with a founder who is "feted at the World Economic Forum in Davos, Switzerland, as the next king of blockchain technology," it describes Arkham as one of the "market watchers puzzling about what happened;" "a crypto analysis firm that followed the movements of ICP tokens on the blockchain;" and Mr. Morel as "a co-founder of Reserve, a cryptocurrency created for hyperinflationary economies." Green Decl. Ex. A, Dkt. 53-1. Nothing in the Article suggests that Arkham and Morel are "disinterested experts" or made an authoritative "objective 'analysis.'" Opp. at 2, 14, 28. Dfinity misleadingly presents these phrases as if they are in the Article—they are not.

## II.     The Three Remaining Statements At Issue Are Not Actionable

Even if considered in isolation, the specific statements at issue cannot support a claim. Dfinity's claim against The Times is premised on five statements. Compl. ¶ 35, Dkt. 1. Dfinity's opposition brief addresses only three of them; the others (Statements 1 and 2) are abandoned. *Robinson v. Fischer*, 09 Civ. 8882 (LAK), 2010 U.S. Dist. LEXIS 137660, at *32 (S.D.N.Y. Dec. 29, 2010) ("Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers

defendants' arguments for dismissing such a claim." (collecting cases)). Dfinity's opposition fails to establish that any of the remaining statements are actionable.

### A. Statement 1 is Not Actionable

Statement 1 is a single sentence: "The [Internet Computer Project], years in the works, generated a lot of buzz last month ahead of its international coin offering, the crypto equivalent of a company going public and listing shared for investors to buy." Compl. ¶ 35(a). Dfinity claims this sentence means that Dfinity "violated federal securities laws" and should be prosecuted. Opp. at 15. *See also id* at 3, 14-16; 23, 24, 37.

Dfinity takes a plain-vanilla sentence and attempts a distorted and strained reading in hopes of conjuring up a libel claim: this effort fails as a matter of law. *See, e.g., Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (N.Y. 1985) (The words at issue "cannot be made [actionable] by a strained or artificial construction."). The attempt also is undermined by Dfinity's own pleadings. Dfinity argues that calling the ICP token launch an "initial coin offering" implies it was unlawful. Opp. at 14-15. And then it points to SEC guidance, which it offers as proof that unregistered initial coin offerings are illegal. *Id.* at 15 n.17. There is just one problem. The guidance does not say that. It says an initial coin offering *may* need to be registered *if* certain indicia are met. *Id.* Dfinity itself argues that the ICP token does not meet those indicia.[3] Calling the ICP token launch "an initial coin offering" implies no wrongdoing.

Dfinity next argues that it was false and defamatory to compare the token launch to an IPO because the ICP token is not a security. Opp. at 14-15, 23. But the statement is an analogy, not a factual assertion. Whether or not the token is a "security" in the conventional sense, it was placed on a market for the first time and traded by investors in ways similar to the trading of

---

[3] "Dfinity's Complaint accurately alleges that that the ICP token is a utility token, used by developers to build applications on the Internet Computer, and that in no way approximates the shares of a public company." Opp. at 23.

3

stocks, currency, and other instruments with which the average reader would be more familiar.[4] That is the innocuous meaning the article reasonably conveyed.

### B. Statement 4 is Not Actionable

Dfinity opposes dismissal of only part of Statement 4: a quote from Arkham that "it appears [Dfinity] quietly allowed the treasury and insiders to send billions of dollars of ICP to exchanges, while making it extremely difficult for their longtime supporters to access the tokens they were promised." Compl. ¶ 35(d); Opp. at 31.[5] As set out previously, this statement presents Arkham's conclusions based on disclosed facts—facts that Dfinity's own pleadings show to be true—and was appropriately contextualized in the Article as a competing allegation on an unresolved matter of debate. NYT Mem. at 8-9, 11-12, 13-14. The sentence is presented as a quote from a critic expressing its analysis of the situation. It appears in the context of competing theories about public events, juxtaposed with Dfinity's responses and denials. And the Article hyperlinks to the Report and to Dfinity's instructions to those "longtime supporters"; readers were free to review the underlying materials and form their own opinions. That is precisely what the doctrine of opinion based on disclosed facts is designed to protect. *See* NYT Mem. at 9.

Dfinity offers no real answer to these arguments. *See* Opp. at 23, 31. Instead, Dfinity argues, first, that market analyses and business journalism cannot contain opinion. *Id.* at 24. But there are no categorical exclusions from Constitutional protections for opinion. *See, e.g.*, *Brimelow v. N.Y. Times Co.*, 2020 U.S. Dist. LEXIS 237463, at *15 (S.D.N.Y. Dec. 17, 2020)

---

[4] The Complaint refers to the token as the ICP's "native cryptocurrency," Compl. ¶ 5, and Dfinity's brief describes it as having "submitted its [ICP] token for listing on various cryptocurrency exchanges." Opp. at 9. Whatever its other functionalities, the ICP token continues to trade on such marketplaces just like any other cryptocurrency.

[5] As initially pled, Statement 4 included the phrase "Dfinity did not follow the playbook of other successful projects." Compl. ¶ 35(d). The Times moved to dismiss claims based on that statement, which is non-actionable opinion and lacks defamatory meaning. Dfinity did not address those arguments in opposition and has therefore abandoned claims based on this phrase.

(rejecting the argument that news reporting categorically does not receive protections for opinion). In making this argument, Dfinity appears to misunderstand the difference between "opinion" as a term used in everyday conversation versus "opinion" as a term of art in First Amendment jurisprudence. Almost all news articles—no matter how scrupulously factual in nature—necessarily employ descriptors and characterizations that would be deemed non-actionable "opinion" as a matter of law. It would be impossible to explain the world without them. For example: a news report on COVID begins by describing the mood in the country as "buoyant" as a result of hospitalization and deaths falling "steeply" and the vaccine rollout "accelerating" towards "an eventual return to normalcy."[6] But almost all of these terms would be classified as "opinion" as a matter of law because whether the country is buoyant or cautious, whether deaths have fallen steeply or less than hoped for—let alone what "normalcy" is—are subjective and incapable of objective proof.

Dfinity next argues that the statements at issue are not rendered opinion just because they begin with the words "it appears," Opp. at 25. But, as set out previously, the statement at issue is non-actionable for multiple reasons, not just because it is prefaced with "it appears."

Finally, to the extent the statement implies or states facts, Dfinity's Complaint and briefing show the statements to be substantially true *See* NYT Mem. at 13-14. Dfinity would have the Court believe that the statement is false because, although a quarter of all ICP tokens were transferred to "certain individuals," who then transferred the tokens to their own wallets, Dfinity argues: 1) those individuals were not "insiders"; and 2) the tokens were moved to wallets, not exchanges. Opp. at 31. These arguments are contradicted by Dfinity's own Complaint, which asserts these "individuals" were "early contributors, seed donors, strategic

---

[6] Apoorva Mandavilli and Benjamin Mueller, *Virus Variants Threaten to Draw Out the Pandemic, Scientists Say*, N.Y. Times (Apr. 3, 2021), https://tinyurl.com/6xb9bbv4.

partners, former team members, etc." Compl. ¶ 36(c). Those are "insiders" by any conventional definition. Second, the Complaint admits that "[o]nce token are distributed and logged on chain, the token holders are free to then do as they wish with their tokens." *Id.* ¶ 36(f). In other words, the Complaint establishes that Dfinity gave insiders a quarter of all ICP tokens and the insiders were then free to sell those tokens. It is plaintiff's burden to show falsity: instead, Dfinity shows the statement to be substantially true.

As for the assertion that it was difficult for longtime supporters to access their tokens, the Complaint also establishes the truth of that statement. Dfinity pleads that small, longtime investors were subject to different restrictions: "Seed investors had their allocations locked in neurons which dissolved monthly." *Id.* ¶ 36(f). The Article itself links to Dfinity's guidance to these investors, the accuracy of which Dfinity does not dispute, showing how restrictive the process was, *see* Green Decl. Ex. C, Dkt. 53-3. Dfinity makes a half-hearted argument that The Times misunderstands the neuron dissolving process but offers no alternative explanation. Opp. at 32. In the end, Dfinity's own papers show it was substantially true "insiders" were "allowed" to receive and trade a large volume of tokens while longtime supporters could not.

### C. Statement 5 is Not Actionable

Statement 5 reports that "Arkham identified 44 'probable insider addresses' that deposited 10 million ICP tokens worth more than $2 billion to exchanges after the initial coin offering, giving the impression they were transferred for trading, not safeguarding. These transfers coincided with significant drops in the price of ICP, the report said. Small investors, left out of the process, were stuck." Compl. ¶ 35(e). As set out above and previously, Dfinity fails to show the falsity of the statement that "probable insiders" placed millions of ICP tokens onto exchanges. *See* NYT Mem. at 13-14. To the contrary, Dfinity's pleadings show substantial truth.

6

And, as set out above, Dfinity's pleadings also show it to be substantially true that small investors were left out of that process and subject to restrictions via "dissolving neurons."

In opposition, Dfinity suggests that there cannot have been "insider-driven market manipulation" because "it instituted lockup restrictions with respect to [Dominic] Williams and other senior members of the Dfinity team following the Genesis event and that many of Dfinity's other executive team members and employees did not even receive their first ICP token allocations until June 21, 2021." Opp. at 16; *see also id.* at 21. Even accepting this statement as true, it does not establish falsity. Dfinity says that one group of people (Williams and "other senior members") were subject to lockups and that another group ("many" of the "other executive team members and employees") did not receive their token allocations until after the price decrease. *Id.* This obviously leaves open that other executives and employees were not subject to the lockup and received their allocations before June 21, 2021. In addition, Dfinity's statement assumes that "insiders" refers only to its management and employees. But the term is not so narrow.[7] Dfinity says nothing about restrictions on the "strategic partners, former team members, etc." whom it pleads received 26% of all ICP tokens. *See* Compl. ¶ 36(c).

### III.  Dfinity Fails to Plead Actual Malice as a Matter of Law

Finally, claims against The Times must be dismissed because Dfinity fails adequately to plead actual malice. First, Dfinity argues that Arkham was so obviously untrustworthy that to relay any of its Report constitutes actual malice. Opp. at 33. But this argument is largely based on events and information Dfinity purportedly learned after publication. *Id.* at 17, 28, 33. Dfinity does not point to any information available *at the time of publication* that showed the Report to be obviously false or Arkham to be inherently untrustworthy to the kind of high standard *New*

---

[7] *See, e.g.*, SEC Glossary, "Insider Trading", https://www.investor.gov/introduction-investing/investing-basics/glossary/insider-trading.

7

*York Times Co. v. Sullivan* and its progeny requires.[8] *See* NYT Mem. at 16. And even the post-publication "information" Dfinity relies on is largely speculation. Making unsupported allegations "on information and belief" is not enough to support actual malice. *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 280 (S.D.N.Y. 2013) (emphasizing courts will dismiss conclusory allegations of actual malice without factual support and collecting cases). *Jaliman v. Selendy*, No. 12820/04, 2005 N.Y. Misc. LEXIS 3291, at *22 (N.Y. Sup. Ct. Westchester Cty. Mar. 7, 2005) ("Actual malice cannot be demonstrated by speculation, surmise, conjecture and suspicion, nor by mere conclusory or unsubstantiated allegations." (cleaned up) (collecting cases)).

Nor is reliance on a single source, alone, an adequate basis for actual malice. Opp. at 34-35. The cases Dfinity relies on only reinforce the inadequacy of its claims. *Id*. at 33-34. In *Zimmerman*, the defendant news organization's sole source *recanted* his allegations pre-publication. *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 284 (D.D.C. 2017). In *Celle v. Filipino Reporter Enterprises*, the defendant admitted he knew his sole source did not have current knowledge *and* "did not say" the information at issue. 209 F.3d 173 (2d Cir. 2000). In *Zuckerbrot v. Lande*, the defendant published thousands of wildly implausible and vitriolic claims, apparently with no real basis. 167 N.Y.S.3d 313, 318 (N.Y. Sup. Ct. 2022). In *Butowsky v. Folkenflik,* defendant allegedly possessed emails, text messages, and public records contradicting his source. No. 18-cv-442, 2019 U.S. Dist. LEXIS 132268, at *31 (E.D. Tex. Aug. 7, 2019). And in *U.S. Dominion, Inc. v. Powell*, defendant Sidney Powell claimed to have evidence of election fraud that did not exist, falsified public records, and relied on experts whom courts previously and publicly had found to be unreliable. 554 F. Supp. 3d 42, 61 (D.D.C. 2021).

---

[8] Dfinity repeatedly states that Morel and Reserve obviously were competitors to Dfinity because they operate a cryptocurrency. Opp. at 2, 5, 9, 13-14, 34, 39, 40; Compl. ¶ 11. At the same time, Dfinity argues that the ICP token is *not* a cryptocurrency and Dfinity's business is to create a new Internet infrastructure in competition with Google, Facebook, and Amazon. *See, e.g.*, Opp. at 7-8, 9-10, 14-15, 23. These arguments are contradictory.

Third, Dfinity argues that The Times "failed to investigate" Arkham's claims. Opp. at 34-36. This is, of course, at odds with pleaded facts showing Dfinity was asked and answered questions about the substance of the allegations, Compl. ¶¶ 3(j), 16, 32, 36(c) & (e), and the Article, which published some of Dfinity's responses. Taking a different tack, Dfinity now argues it was actual malice not to disclose to Dfinity when seeking comment that the allegations were made *by* Arkham. Opp. at 5, 15, 35-36. But Dfinity does not explain why it would matter whether Arkham or some other "market watcher" made the allegations, let alone how that would constitute "purposeful avoidance" of the truth by The Times. Dfinity also claims certain allegations were never put to them—such as an accusation that they were "scamming investors," or engaged in "fraud." *Id.* at 10-11, 15. But these allegations do not appear in the Article.

Fourth, Dfinity argues that post-publication information and a refusal to "correct" the Article constitutes actual malice. But a refusal to correct—which occurs after publication—is not probative of actual malice, *see, e.g. McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996) ("[Plaintiff] presents no authority . . . nor are we aware of any, for the proposition that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast after publication."); *Biro*, 963 F. Supp. 2d at 281 ("[A] failure to retract occurs, by definition, after publication, meaning that its probative value as to a defendant's state of mind at the time of publication is dubious at best."). The two cases Dfinity cites provide no support for its argument. *See* Opp. at 36. The first case does not even address this issue and the second, *Tiversa Holding Corp. v. LabMD, Inc.*, No. 13-1296, 2014 U.S. Dist. LEXIS 54632, at *21 (W.D. Pa. Apr. 21, 2014) concerns a situation where the defendant made defamatory statements, was informed they were false, and then made *new* defamatory statements of the same nature—a very different set of facts.

9

Fifth, Dfinity argues that there must have been "a coordinated hit job" because The Times published its article shortly after Arkham published the Report. Opp. at 37-38. What Dfinity is describing is a routine event: journalists frequently receive embargoed pre-publication copies of books, reports, studies, etc., prepare articles about the embargoed work, and then publish when the embargo is lifted. Compliance with an embargo is not evidence of knowing falsity and does not give rise to an inference of actual malice. The cases Dfinity relies on do not concern actual malice (or even journalism) and are inapposite. *See* Opp. at 38 n.34.[9]

Finally, Dfinity relies on *Palin v. New York Times*, a case where both the jury and the court recently concluded actual malice was not proven. 1:17-cv-04853-JSR (S.D.N.Y.). But even at the pleading stage, the alleged facts are obviously distinguishable: there is no pleaded evidence The Times was hostile to Dfinity, no hyperlink in the Article itself indicated falsity, no third party, objective information contradicted Arkham's conclusions. *Compare* Opp. at 39, *with Palin v. New York Times Co.*, 940 F.3d 804, 813-17 (2d Cir. 2019). The *Palin* case again serves only to show the deficiencies in Dfinity's claims against The Times, which must be dismissed.

---

[9] *Project Veritas v. New York Times Co.*, No. 63921/2020, 2021 N.Y. Misc. LEXIS 2264 (N.Y. Sup. Ct. Westchester Cty. Mar. 18, 2022), did concern actual malice. There, The Times reported on an academic report that a video was "deceptive." The New York Supreme Court considered actual malice adequately pled based on multiple factors—not just the timing of publication. *Id.* at *19-22. However, that decision has been stayed, *Project Veritas v. New York Times Company*, 2021 N.Y. App. Div. LEXIS 5982 (1st Dept. 2021), and is on appeal. Project Veritas's claims against the academic institution for the same report were recently dismissed as a SLAPP and Project Veritas ordered to pay costs, further calling the decision into question. *See Project Veritas v. Leland Stanford Jr. Univ.*, 2022 U.S. Dist. LEXIS 138962 (W.D. Wash. Aug. 4, 2022).

## CONCLUSION

For all the reasons set forth above, Defendant respectfully requests that the Court dismiss the Complaint with prejudice and provide such other and further relief as the Court deems appropriate.

Dated: New York, NY
       November 11, 2022

Respectfully submitted,

*/s/Dana R. Green*
David E. McCraw
Dana R. Green
The New York Times Company
Legal Department
620 Eighth Avenue
New York, NY 10018
Phone: (212) 556-5290
Facsimile: (212) 556-4634
Email: dana.green@nytimes.com

*Attorneys for Defendants The New York Times, Andrew Ross Sorkin, and Ephrat Livni*